MORALES v STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY

Docket No. 275224. Submitted May 13, 2008, at Detroit. Decided May 27,
2008. Approved for publication July 24, 2008, at 9:00 a.m.

Jorge Morales brought an action in the Macomb Circuit Court
against State Farm Mutual Automobile Insurance Company and
Kenneth Luick, seeking no-fault benefits for injuries he suffered in
an automobile accident. A jury found that Morales's inability to
work and his need for attendant care resulted from injuries caused
by the accident rather than the various unrelated disabling
conditions from which he suffered. The court, Diane M. Druzinski,
J., entered a judgment for Morales of nearly $600,000, which
included expenses, work-loss benefits, attorney fees and costs, and
penalty interest. State Farm appealed.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion by admitting
evidence related to the manner in which State Farm processed
Morales's claim. Although an insurer is liable for penalty interest if
benefits are overdue regardless of why the benefits were not timely
paid, Morales bore the burden of proving a loss after which State
Farm failed to pay the claims within 30 days. Accordingly, the
claims-handling evidence was relevant to facts that were of conse-
quence to the action. It was not necessary for the evidence to directly
prove an element of Morales's claim because the evidence was
material to whether State Farm fairly reviewed Morales's claim.

2. The trial court did not abuse its discretion by admitting the
testimony of a registered nurse on the subject of the cost of
attendant care. The nurse's testimony was admissible under MRE
703 because, as the trial court permissibly inferred, it was based on
her own direct, personal knowledge of the pay range of in-home
health-care aides and not on a hearsay source. Further, her
testimony on this point was corroborated by the Morales's econo-
mist. Accordingly, the trial court did not err by denying State
Farm's motion for judgment notwithstanding the verdict on this
basis.

3. The fact that Morales successfully asserted a claim for
disability benefits from the Department of Veterans Affairs (VA)

does not judicially estop him from maintaining a claim for no-fault benefits because the application for VA benefits was based on disabilities incurred during his service in Vietnam, and was therefore not wholly inconsistent with his position in seeking no-fault benefits on the basis of injuries incurred in the motor-vehicle accident.

4. In light of the fact that there was no error warranting reversal or other relief, there is no basis on which to vacate the attorney-fee award.

Affirmed.

1. INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE — EVIDENCE — CLAIMS HANDLING.

Testimony regarding an insurer's claims-handling practices in connection with a claim for no-fault personal protection insurance benefits is relevant to whether the insurer fairly reviewed the plaintiff's claim and to whether the insurer is liable for penalty interest (MCL 500.3107, 500.3142; MRE 402).

2. INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE — EVIDENCE — ATTENDANT-CARE RATES.

Testimony relating to the cost of in-home attendant care in connection with a claim for no-fault personal protection insurance benefits may be based on an expert's personal knowledge (MRE 703).

*Law Offices of Paul Zebrowski* (by *Paul Z. Zebrowski* and *Thomas A. Biscup*) (*Bendure & Thomas*, by *Mark R. Bendure*, of counsel), for Jorge Morales.

*Hewson & Van Hellemont, P.C.* (by *James F. Hewson*), and *Gross, Nemeth & Silverman, P.L.C.* (by *James G. Gross*), for State Farm Mutual Automobile Insurance Company.

Before: BANDSTRA, P.J., and FITZGERALD and MARKEY, JJ.

PER CURIAM. Defendant State Farm Mutual Automobile Insurance Company appeals by right the judgment entered on a jury award of no-fault benefits under MCL 500.3107 for the plaintiff, Jorge Morales. No-fault per-

sonal protection insurance benefits (so-called "PIP benefits") are payable for "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle." MCL 500.3105(1). The jury found that plaintiff sustained an injury in an automobile accident, thereby incurring reasonable and reasonably necessary allowable expenses of $216,000, work-loss benefits of $76,032, and replacement services expenses of $21,900. The jury also awarded $62,786 as penalty interest under MCL 500.3142. Subsequently, the trial court awarded plaintiff attorney fees of $148,562.50 under MCL 500.3148(1), taxable costs of $12,478.54, and judgment interest. The court entered judgment for plaintiff in the amount of $597,351.40. We affirm.

## I. FACTUAL BACKGROUND

Plaintiff was injured in a rollover accident on June 12, 2002, while driving a boom truck in the course of his electric-sign-repair business. Before the accident, plaintiff had various health problems: he had a heart attack in 1993, was an insulin-dependent diabetic, and suffered hypertension and arteriosclerosis. Plaintiff's family doctor, Dr. Robert Brateman, diagnosed plaintiff with a closed head injury as a result of the accident, but on November 11, 2002, Dr. Brateman released plaintiff to return to work. Plaintiff and his wife maintain that he tried to return to work in a supervisory capacity, but the attempt lasted only one or two weeks because plaintiff experienced dizziness, could not distinguish color-coded wiring, made unsafe decisions, and argued with employees. Defendant initially paid plaintiff work-loss benefits but stopped after three months and did not pay any further no-fault benefits.[1]

---

[1] Defendant did pay plaintiff three years of benefits under a separate disability policy.

On December 17, 2002, plaintiff experienced an acute cardiac event resulting in his hospitalization. Although this was initially thought to have been another myocardial infarction (heart attack), the incident was diagnosed as unstable angina and treated with angioplasty. Plaintiff does not dispute that this incident was temporarily disabling for the period of hospitalization and few days of recovery.

In February 2003, plaintiff suffered an incident of confusion and disorientation, which was attributed to a transient ischemic attack (TIA). Dr. Brateman testified that the TIA had only temporary effects and would not permanently disable plaintiff. Dr. Brateman conceded that plaintiff might also have small vessel disease of the brain caused by his diabetes and arteriosclerosis, which could produce similar symptoms of confusion, memory loss, dizziness, or sometimes a TIA.

On November 3, 2003, plaintiff signed an application for a pension or compensation from the federal Department of Veterans Affairs (VA). Plaintiff testified that his wife filled out all the forms for him. Plaintiff's wife testified that someone had suggested to her that because her husband was a veteran, the VA might provide benefits. Plaintiff's wife asked Dr. Brateman to write letters supporting the benefit application. Dr. Brateman wrote a letter for the purpose of the VA-benefits application on November 3, 2003, that listed, among plaintiff's other ailments, "ischemic heart disease, post myocardial infarction with congestive heart failure and a second myocardial infarction in 2002" and indicated plaintiff's "inability to work secondary to ischemic heart disease, diabetes neuropathy, and peripheral vascular occlusive disease." This letter did not mention plaintiff's motor vehicle accident or plaintiff's having a closed head injury. Apparently, the VA responded to the

application with a letter dated December 3, 2003, which requested that plaintiff sign medical releases and submit additional information to support his claim. Dr. Brateman wrote a second letter on December 14, 2003, that was sent directly to the VA representative processing plaintiff's claim. In this letter, Dr. Brateman listed plaintiff's problems as "1) ischemic heart disease, post myocardial infarction x2 with congestive heart failure; 2) motor vehicle accident 6/12/02 with closed head injury, memory impairment, and subsequent inability to work; 3) chronic vertigo, caused by the auto accident note above; 4) type I, diabetes mellitus; 5) CVA (stroke); 6) diabetic neuropathy; 7) hypertension; 8) traumatic brain injury, as above." Plaintiff also signed a form dated December 15, 2003, which said that he had signed medical releases at the local veterans' office to release all his medical records and asked that his claim be processed on the basis of his medical records.

Plaintiff and his wife met several times with a VA representative. Several different VA doctors examined plaintiff. Plaintiff's wife testified that plaintiff's eligibility for VA benefits arose from plaintiff's service in Vietnam and exposure to Agent Orange, which was believed to be a causative factor in plaintiff's diabetes and related circulatory problems. At some point before September 15, 2004, the VA had evidently awarded plaintiff benefits, because on that date, the VA issued a decision increasing plaintiff's disability rating as follows:

### DECISION

1. Evaluation of coronary artery disease status post two myocardial infarctions; with stent placement, which is currently 60 percent disabling, is increased to 100 percent effective November 19, 2002.

2. Service connection for peripheral vascular disease of the right lower extremity is granted with an evaluation of 40 percent effective November 19, 2003.

3. Service connection for peripheral vascular disease of the left lower extremity is granted with an evaluation of 20 percent effective November 19, 2003.

4. Entitlement to special monthly compensation based on Housebound criteria being met is granted from November 19, 2002.

5. Evaluation of diabetic retinopathy, which is currently 0 percent disabling, is increased to 30 percent effective November 19, 2002. Entitlement to increased evaluation is deferred.

6. A decision on entitlement to compensation for Meniere's syndrome is deferred.

The VA decision listed the evidence on which the decision was based: (1) claims file review, (2) the medical report of Dr. Bruce R. Garretson, dated August 13, 2004, and (3) outpatient treatment reports from the VA hospital in Detroit from January 13, 2004, through July 30, 2004.

Against this background, the major issue of this case was tried: Were plaintiff's inability to work and his need for attendant care causally related to injuries he received in the June 12, 2002, rollover accident, or had he recovered from any auto-accident injuries by November 2002 and subsequently become disabled by his preexisting diabetes-related diseases that gave rise to the 100 percent VA disability rating? Defendant's theory of the case was the latter. Plaintiff's theory of the case was that while he had serious preexisting diabetes-related ailments, they did not prevent him from working before the accident and, but for the accident, he would have continued working except for the brief hospitalization and recovery days after his December 2002 heart incident and February 2003 TIA. Plaintiff argued that his

preexisting condition made him more susceptible to the disabling effects of a closed head injury. Plaintiff also theorized that defendant should have had his claim reviewed after November 2002 by properly qualified medical personnel, such as a neuropsychologist who specialized in closed head injuries, and that its failure to do so was improper and unfair. A summary of the expert testimony presented at trial on the major issue of the case follows.

Dr. Brateman, plaintiff's family physician, diagnosed plaintiff as sustaining a closed head injury in the accident, noting that plaintiff suffered from dizziness, confusion, memory loss, chronic vertigo, and headaches. According to Dr. Brateman, plaintiff's closed head injury disabled him from working. Dr. Brateman also noted a change in plaintiff's personality after the accident. Dr. Brateman further testified that plaintiff required constant attendant care. With respect to the December 2002 heart incident requiring angioplasty, Dr. Brateman testified that, absent the closed head injury from the auto accident, plaintiff would have only been off work for a "number of days to maybe a few weeks." Similarly, Dr. Brateman testified that the TIA plaintiff suffered in February 2003 had temporary effects that resolved quickly, unlike the closed head injury from the accident "with an actual bruise to the brain" that caused long-lasting symptoms.

In July 2003, plaintiff's treating neurologist referred him to clinical neuropsychologist Dr. Michael Vredevoogd for an evaluation. Dr. Vredevoogd testified at trial that after reviewing plaintiff's medical history and performing numerous tests, he had concluded that plaintiff's closed head injury interacted with his diabetes-related vascular condition so as to disable him. Dr. Vredevoogd opined that plaintiff's vascular condition alone would not have been

disabling, but it made plaintiff more susceptible to being disabled by his closed head injury. Although he learned of the closed head injury from plaintiff's medical history, Dr. Vredevoogd reached the same diagnosis from his own testing data.

Plaintiff's neurologist also referred plaintiff to speech pathologist Debra Thomas in September 2003. After conducting a cognitive assessment of plaintiff's speech and language, Ms. Thomas concluded that plaintiff had mild to moderate deficits resulting from a closed head injury sustained in an automobile accident.

Dr. John Blase, another neuropsychologist, examined plaintiff in June 2005. Dr. Blase opined at trial that a TIA would not have a lasting disabling effect. After administering a battery of tests to plaintiff, Dr. Blase formed the opinion that plaintiff suffered from a traumatic brain injury. He further opined that plaintiff's brain injury was disabling with regard to plaintiff's ability to work and to care for his own needs and that plaintiff required constant supervision. Although Dr. Blase administered a different battery of tests to plaintiff than did Dr. Vredevoogd in 2003, he reached the same conclusion relative to plaintiff's preexisting diabetes-related vascular condition. Plaintiff's diabetes, hypertension, and vascular disease, which were not disabling before the accident, rendered plaintiff subject to greater behavioral impairment as a result of the traumatic brain injury received in the accident.

Defendant required plaintiff to submit to an independent medical examination by Dr. Choo Sun Rim, a neurologist, who did not testify at trial. Dr. Rim's report, apparently admitted at trial as part of the defendant's claim records, indicated that plaintiff had suffered a head injury in the accident but that it appeared to be relatively minor. The head injury was

noted as possibly explaining the dizziness and headaches plaintiff experienced. Dr. Rim also opined in his report that the intellectual and behavioral alteration plaintiff experienced did not seem to be related to brain injury but to small vessel disease of the brain.

Defendant did present at trial the deposition testimony of Dr. Gerald Levinson, a cardiologist who examined plaintiff at defendant's request. Dr. Levinson claimed to have not found any indication in plaintiff's medical records, other than Dr. Brateman's opinion, to document plaintiff having a closed head injury. But Dr. Levinson admitted that he did not have the expertise to diagnose a closed head injury and that he would defer to a neuropsychologist in that regard.

After the proofs were closed and counsel argued their positions, the trial court instructed the jury with M Civ JI 35.02 regarding plaintiff's burden of proof on the critical issue of the case. Specifically, the court instructed the jury that the plaintiff had the burden of proving (1) that his injuries arose out of the operation or use of a motor vehicle as a motor vehicle and (2) that plaintiff suffered a loss of income from work that he would have performed during the first three years after the accident had he not been injured. Counsel for both parties expressed satisfaction with the trial court's instructions to the jury. The jury was also provided a detailed jury-verdict form approved by both parties. The jury completed the verdict form and found in plaintiff's favor, and judgment was entered accordingly.

## II. EVIDENTIARY ISSUES

### A

Defendant first argues that it was denied a fair trial by the admission of irrelevant and prejudicial evidence

regarding the manner in which it processed plaintiff's claim for no-fault benefits. This evidence came through the testimony of a former claims executive for defendant who was qualified as an expert in handling insurance claims and from cross-examination of those of defendant's employees who were involved with plaintiff's claim. The trial court ruled that the testimony of plaintiff's expert was relevant to whether plaintiff submitted reasonable proof of loss to defendant, thus rendering plaintiff's claimed benefits overdue and entitling plaintiff to statutory penalty interest. We conclude the trial court did not abuse its discretion by admitting the claims-handling evidence and, even if it did, reversal is not warranted.

A trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion. *Elezovic v Ford Motor Co*, 472 Mich 408, 419; 697 NW2d 851 (2005). The trial court abuses its discretion if its decision is outside the range of principled outcomes. *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Lewis v LeGrow*, 258 Mich App 175, 200, 214; 670 NW2d 675 (2003). Moreover, even if a court abuses its discretion in admitting or excluding evidence, the error will not merit reversal unless a substantial right of a party is affected, MRE 103(a), and it affirmatively appears that the failure to grant relief is inconsistent with substantial justice, MCR 2.613(A). See *Chastain v Gen Motors Corp*, 467 Mich 888 (2002); *Lewis, supra* at 200.

Generally, all relevant evidence is admissible and irrelevant evidence is not. MRE 402; *Waknin v Chamberlain,* 467 Mich 329, 333; 653 NW2d 176 (2002). Evidence is relevant if it has any tendency to make the

existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; *Waknin, supra* at 333. The trial court also has discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *Lewis, supra* at 199. " 'Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.' " *Waknin, supra* at 334 n 3, quoting *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

Defendant argues that the claims-handling evidence was not relevant to penalty interest under MCL 500.3142 because an insurer is liable for penalty interest if benefits are overdue regardless of the reason the insurer does not timely pay the benefits. "Penalty interest must be assessed against a no-fault insurer if the insurer refused to pay benefits and is later determined to be liable, irrespective of the insurer's good faith in not promptly paying the benefits." *Williams v AAA Michigan*, 250 Mich App 249, 265; 646 NW2d 476 (2002), citing *Davis v Citizens Ins Co of America*, 195 Mich App 323, 328; 489 NW2d 214 (1992). While we agree with the premise of defendant's argument, it does not follow that the claims-handing evidence was irrelevant. MCL 500.3142(2) provides in part: "Personal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained." Whether plaintiff provided reasonable proofs of loss and whether, after so doing, the defendant failed to pay the claims within 30 days were questions before the jury that plaintiff bore the burden of proving. See M Civ JI

35.04. The focus of the evidence in this regard was on what plaintiff provided defendant and whether it constituted "reasonable proof of the fact and of the amount of loss sustained." The claims-handling evidence was therefore relevant to facts that were of consequence to the action, whether plaintiff provided defendant reasonable proof of the fact and amount of the loss sustained for purpose of penalty interest under MCL 500.3142(2).

Additionally, defendant's view of relevancy with respect to the main causation issue in this case is too narrow. A material fact need not directly prove an element of a claim or defense provided it is within the range of litigated matters in controversy. *People v Mills,* 450 Mich 61, 67-68; 537 NW2d 909, modified 450 Mich 1212 (1995). To be relevant under MRE 401, a fact must be material, i.e., it must be of consequence to the action. *Id.* at 66-67. " 'Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial.' " *Id.* at 67, quoting 1 McCormick, Evidence (4th ed), § 185, p 773. A fact at issue in this case was whether defendant fairly reviewed plaintiff's claim. Plaintiff's theory of the case was that defendant had not fairly reviewed his claim. Defendant, on the other hand, believed not only that had it fairly reviewed and denied plaintiff's no-fault claim, but also that it had overpaid it. Consequently, whether defendant fairly reviewed plaintiff's claim was within the range of the litigated controversy and was a fact of consequence to the action. Although the evidence does not directly prove an element of plaintiff's claim for PIP benefits, it is still consequential because, if believed, it makes plaintiff's theory of the case more probable than it would be without the evidence. The evidence was

relevant to whether plaintiff's claim was denied because it was not causally related to the accident (defendant's position) or because it was a valid claim that was not handled fairly (plaintiff's theory). The evidence was a brick in the wall that was plaintiff's case. See, e.g., *People v Brooks*, 453 Mich 511, 519; 557 NW2d 106 (1996), quoting 1 McCormick, Evidence (4th ed), § 185, p 776.

Defendant also argues that even if the evidence were relevant, and therefore properly admitted into evidence, its probative value was substantially outweighed by the danger of unfair prejudice. MRE 403. Defendant conflates with this argument alleged improper argument by plaintiff's counsel. But other than moving for a mistrial after plaintiff's opening statement, which was denied and not appealed, defendant has neither properly preserved nor appealed a claim of misconduct by counsel. Further, the jury verdict of only 40 percent of what plaintiff requested does not reflect a decision based on passion or bias. Moreover, to the extent that the trial court abused its discretion either by admitting the claims-handling evidence or by failing to exclude the evidence under MRE 403, our review of the trial record as a whole convinces us that reversal is not warranted because it does not affirmatively appear that the failure to grant relief is inconsistent with substantial justice. MCR 2.613(A); *Chastain, supra*; *Lewis, supra* at 200.

B

Defendant next takes issue with the testimony of registered nurse Laura Kling regarding the cost of attendant care. Defendant contends that Kling testified as an expert and her testimony was supported by inadmissible hearsay contrary to MRE 703, which now requires that the facts underlying an expert's opinion

be in evidence. Defendant argues that because this testimony was inadmissible and the only evidence regarding the cost of attendant care, the trial court should have granted defendant a judgment notwithstanding the verdict (JNOV). We disagree.

We review de novo the trial court's ruling on a motion for JNOV. *Wiley v Henry Ford Cottage Hosp,* 257 Mich App 488, 491; 668 NW2d 402 (2003). The trial court should grant a JNOV motion only when the evidence and all legitimate inferences viewed in a light most favorable to the nonmoving party fail to establish a claim as a matter of law. *Foreman v Foreman,* 266 Mich App 132, 136; 701 NW2d 167 (2005). To succeed on this issue, defendant must establish not only that the trial court abused its discretion by admitting Kling's testimony, but also that there was no other admissible evidence to support the jury's award of benefits for attendant care.

The trial court denied defendant's motion for JNOV on this issue, reasoning that Kling's testimony was admissible under MRE 703 because it was based on Kling's own direct, personal knowledge, citing *Brzozowski v Wondrasek,* unpublished opinion per curiam of the Court of Appeals, issued November 10, 2005 (Docket Nos. 256701 and 259098), p 5.

Having reviewed the record de novo, we find no error of law in the trial court's analysis and no abuse of discretion in admitting Kling's testimony. Moreover, contrary to defendant's argument on appeal, the testimony, of plaintiff's economist, Nitin Paranjpe, corroborated Kling's testimony regarding the cost of attendant care. Although Paranjpe based his calculation for attendant care on Kling's numbers, he testified about independent sources, which it may fairly be inferred Paranjpe found were consistent with Kling's testimony.

Kling testified that she was a registered nurse with 20 years' experience working in rehabilitation settings in hospitals, homes, and other facilities. She had worked for many years with clients who had closed head injuries, providing case management and life care planning. She had personally reviewed plaintiff's care needs and determined he needed 24-hour daily care by a home-health-care aide. Kling then testified:

*Q.* All right. Now, you have experience or background in the home health aide agency setting, correct?

*A.* Correct.

*Q.* You understand what they charge?

*A.* That's correct.

*Q.* Are here [sic] good agencies and bad agencies?

*A.* There are good agencies, there are bad agencies, there is bad home health aide, there's good home health aid[e]s. My experience when I provide attendant care to a client, we have to make some changes along the way. We have to really—a case manager has to monitor the situation closely.

* * *

*Q.* All right. Now, with these home health agencies they have rates they charge?

*A.* Correct.

*Q.* And do they vary?

*A.* Yes.

*Q.* Do you have experience with what they charge?

*A.* Yes.

Defendant then interposed an objection to Kling's testifying about the cost of home-health-care aides on the bases of lack of foundation and hearsay. With respect to the former, defendant clarified that Kling had

not specified to what agencies she was referring. With respect to the hearsay objection, defense counsel argued that Kling's knowledge had to be based on hearsay. But defense counsel did not request an opportunity to voir dire the witness to confirm his assumption regarding the source of Kling's knowledge. Nor did counsel specifically object on the basis of MRE 703 that the facts or data on which Kling based her opinion must be in evidence. Viewing the existing record in the light most favorable to plaintiff, the trial court did not err by inferring that Kling had personal, nonhearsay knowledge on which to base her testimony that aides in 2005 were paid in the range of $18 to $24 an hour.[2] MRE 703 does not preclude an expert from basing an opinion on the expert's personal knowledge. *Brzozowski, supra* at 5; see also Dubin, Weissenberger, & Stephani, Michigan Evidence: 2008 Courtroom Manual, pp 251-252. So, the trial court's decision to admit Kling's testimony was within the range of reasonable and principled outcomes. *Orr, supra* at 588-589. It follows that the trial court properly denied defendant's motion for JNOV. *Foreman, supra* at 136; *Wiley, supra* at 492.

In addition, Paranjpe, an economist and statistician employed by an econometrics and employment research firm, testified that his company had conducted surveys regarding home-health-care aides in 2002 and 2005. Paranjpe also obtained information from the state of Michigan's website that the state paid home-health-care aides at the rate of $17.50 an hour in 2002. These sources, Paranjpe testified, were "indications as to what the market rate might be." Thus, although Paranjpe

---

[2] Contrary to defendant's argument on appeal, viewed in the light most favorable to plaintiff, Kling's personal knowledge regarding home-health-care aides was not 20 years old; rather, she had more than 20 years' experience in case management and life-care planning.

used Kling's numbers to calculate attendant-care benefits, it is fair to infer from his testimony that he independently verified Kling's data. Defendant argues that Paranjpe also relied on hearsay, but his own company's surveys would not be hearsay and, if they were, they would be admissible under MRE 803(17), which excepts from the rule against hearsay "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." This same hearsay exception applies to government information on wages for different occupations such as a health-care aide, even though the information was obtained from the Internet. See *State v Erickstad*, 620 NW2d 136, 145-146 (ND, 2000) (affirming the admission in evidence under the identical hearsay exception of a police officer's testimony regarding the value of a pickup truck based on accessing the Kelley Blue Book Internet website).

### III. JUDICIAL ESTOPPEL

Defendant argues that plaintiff is judicially estopped from asserting a claim for work-loss benefits or replacement services after his December 17, 2002, heart incident because he successfully asserted a claim for VA disability benefits based on causes unrelated to his motor vehicle accident. Because defendant raised this issue on a motion for directed verdict and on its motion for JNOV and because it presents a question of law, our review is de novo. *James v Alberts*, 464 Mich 12, 14; 626 NW2d 158 (2001); *Wiley, supra* at 491.

The doctrine of judicial estoppel is intended to maintain the consistency of court rulings and to keep litigants from playing "fast and loose" with the legal system. See *Paschke v Retool Industries*, 445 Mich 502, 509-510; 519 NW2d 441 (1994). Under the doctrine of

judicial estoppel, " 'a party who has successfully and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding.' " *Id*. at 509, quoting *Lichon v American Universal Ins Co*, 435 Mich 408, 416; 459 NW2d 288 (1990) (emphasis omitted). The "prior success" model of the doctrine applies in Michigan. *Paschke, supra* at 509.

> Under the "prior success" model, the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted that party's position as true. Further, in order for the doctrine of judicial estoppel to apply, the claims must be wholly inconsistent. [*Id*. at 510 (citations omitted).]

As in *Paschke*, we conclude that the doctrine of judicial estoppel has no application to the facts of this case because the position plaintiff took with respect to his application for benefits from the VA was not "wholly inconsistent" with his position in claiming no-fault benefits. Veterans' benefits are dependent on establishing a service-connected disability. The application plaintiff submitted to the VA was for benefits based on plaintiff's service in Vietnam and exposure to Agent Orange, which is allegedly causally linked to diabetes and vascular disease. Plaintiff signed an application for benefits, signed medical releases for his medical records, and requested that the VA review his medical records and award benefits. Other than an initial letter written by plaintiff's family doctor that does not mention the motor vehicle accident, defendant does not identify any evidence plaintiff ever asserted to the VA that he was not also injured in a motor vehicle accident. In fact, Dr. Brateman's second letter to the VA on December 14, 2003, clearly notes that plaintiff received a closed head injury in the June 12, 2002, motor vehicle

accident. The fact that the VA, on the bases of plaintiff's medical records and its own treatment reports regarding plaintiff, determined that plaintiff's coronary artery disease was 100 percent disabling does not preclude plaintiff from being disabled by other factors as well. Indeed, the VA determination also lists plaintiff as having other service-connected disabilities based on other ailments such as peripheral vascular disease (40 percent right lower—20 percent left lower) and diabetic retinopathy (30 percent). Similarly, plaintiff did not assert in the present case for no-fault benefits that his closed head injury was the sole factor causing his disability. Rather, he asserted that his preexisting condition made him more susceptible to the disabling effects of the closed head injury he suffered in the accident. In sum, plaintiff's position in his application for VA benefits is not "wholly inconsistent" with his claim for no-fault benefits. Therefore, judicial estoppel does not apply. *Paschke, supra* at 509-510.

Moreover, defendant relies on *MacDonald v State Farm Mut Ins Co*, 419 Mich 146; 350 NW2d 233 (1984), for its argument on this issue. That case was not decided on the ground of judicial estoppel but rather on the basis that MCL 500.3107(1)(b) relieves an insurer from liability for work-loss benefits if a supervening cause would have prevented the claimant from working even if the motor vehicle accident had not occurred. In MacDonald's case, he suffered a heart attack two weeks after the auto accident, and "[a]fter that date [Mac-Donald] would have earned no wage even had the accident not occurred and, therefore, is ineligible for work-loss benefits after that date under [former MCL 500.3107(b), now MCL 500.3107(1)(b)]." *MacDonald, supra* at 152. The Court held that this result was not altered by former MCL 500.3107a, now MCL 500.3107(1)(a), which concerns those who are tempo-

rarily unemployed. *MacDonald, supra* at 152-154. In sum, under MCL 500.3107(1)(b) as interpreted by *MacDonald,* a supervening cause may apply to preclude work-loss benefits if the claimant would not have been able to work even if no auto accident had occurred. Stated otherwise, there is a "but for" factual issue like proximate causation: if, but for the accident, plaintiff would have been able to work, work-loss benefits are payable. On the other hand, even if no accident had occurred but plaintiff would not have been able to work, no work-loss benefits would be payable.

The essence of defendant's defense at trial was that plaintiff's preexisting medical conditions became disabling after, but not because of, any injuries he received in the motor vehicle accident. But plaintiff presented testimony from his family doctor, two neuropsychologists, and other health professionals that it was plaintiff's closed head injury from his motor vehicle accident interacting with plaintiff's susceptible diabetes-caused condition that kept him from working. One of defendant's own experts conceded that plaintiff suffered a closed head injury in the accident, albeit a mild one, and defendant's other expert, cardiologist-internist Dr. Levinson, testified that he would defer to a neuropsychologist to diagnose a closed head injury. Although defense counsel ably contested plaintiff's case by presenting evidence that plaintiff's symptoms could be explained by small vessel brain disease, in the end, this was a factual question for the jury to decide. All the medical evidence and the VA decision regarding plaintiff's service-connected disabilities went to the jury. The trial court instructed the jury regarding the statutory element of plaintiff's work-loss claim and the "but for" test that formed the basis for the *MacDonald* decision: "That Jorge Morales suffered a work loss which consists of a loss of income from work the plaintiff would have performed during the first three years after the acci-

dent had he not been injured." Defendant requested no additional instruction based on *MacDonald* and, in fact, expressed satisfaction with the trial court's instructions. The jury decided this issue in plaintiff's favor, and there is no reason to set aside the jury's verdict.

### IV. ATTORNEY FEES

After the jury's verdict, plaintiff moved the trial court for attorney fees pursuant to MCL 500.3148(1), which provides that an attorney representing a claimant for no-fault benefits may be awarded a reasonable fee as a charge against the no-fault insurer "if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment." The trial court made such a finding in this case and granted plaintiff's motion for a reasonable attorney fee, which the court determined to be $148,562.50 under the facts and circumstances of this case. Defendant does not contest the substantive merits of the attorney-fee award. Instead, defendant only argues that this Court should vacate the attorney-fee award if the Court grants relief on one or more of the other issues defendant raises on appeal. Because we have found no error warranting reversal or other relief, defendant's request for relief on this issue also fails.

We affirm.