# STATE OF MICHIGAN

# COURT OF APPEALS

---

Estate of PERRY PACE, by its Personal
Representative, KATIE BARKER,

       Plaintiff-Appellee,

v

HURLEY MEDICAL CENTER, DR. JOHN DOE,
DENIKA LLOYD, NURSE 1 JANE DOE,
NURSE 2 JANE DOE, and NURSE 3 JANE DOE,

       Defendants,

and

DR. PATRICK HAWLEY,

       Defendant-Appellant.

UNPUBLISHED
January 26, 2017

No. 328584
Genesee Circuit Court
LC No. 13-100524-NH

---

Estate of PERRY PACE, by its Personal
Representative, KATIE BARKER,

       Plaintiff-Appellee,

v

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, doing business as
UNIVERSITY OF MICHIGAN HEALTH
CENTER, doing business as UNIVERSITY OF
MICHIGAN HOSPITAL,

       Defendant-Appellant.

No. 328997
Court of Claims
LC No. 13-000072-MH

---

Before: BECKERING, P.J., and SAWYER and SAAD, JJ.

PER CURIAM.

-1-

Plaintiff, as the personal representative of the estate of her son Perry Pace, brought these companion wrongful death medical malpractice actions against defendants Patrick Hawley, M.D., Hurley Medical Center, Denika Lloyd, and John and Jane Doe defendants ("the Hurley defendants"), and Dr. Hawley's employer, the Board of Regents of the University of Michigan, d/b/a University of Michigan Health Center, d/b/a University of Michigan Hospital ("U of M"). Plaintiff's claims arise from Dr. Hawley's treatment of plaintiff's infant son, Perry Pace, who died three days after Dr. Hawley treated him at the Hurley Medical Center Emergency Department. The two actions were joined for trial. The circuit court case was decided by a jury, and the Court of Claims case was decided by the trial court. Plaintiff was awarded judgment against Dr. Hawley and U of M for $1,250 in economic damages and $444,900 in non-economic damages (reduced from $930,000 pursuant to the statutory cap in MCL 600.1483), plus taxable costs in the amount of $22,274.93, and prejudgment interest of $21,768.08, for a total judgment of $490,193.01, which was awarded jointly and severally against both defendants. Dr. Hawley and U of M each appeal as of right. We affirm.

## I. FACTS AND PROCEEDINGS

On December 3, 2010, plaintiff brought seven-week-old Perry by ambulance to the emergency department (ED) of Hurley Medical Center, with complaints of diarrhea, projectile vomiting, and nasal discharge. Perry was evaluated by Dr. Hawley, who provided emergency physician services to Hurley pursuant to a contract with U of M. Dr. Hawley diagnosed the child with rhinorrhea (runny nose) and diaper rash. He prescribed a nasal spray and an ointment for the rash. He advised plaintiff to breastfeed Perry more frequently (every hour and 15 minutes or hour and 30 minutes) and to supplement with Pedialyte to avoid dehydration from vomiting and diarrhea. On December 6, 2010, Perry was found unresponsive. Perry was returned to the ED and pronounced dead. The medical examiner determined that Perry died of dehydration, but was unable to determine the cause of the dehydration.

Plaintiff's complaints alleged that Dr. Hawley breached the standard of care by failing to recognize that Perry was experiencing worsening dehydration and failing to properly treat the dehydration. Plaintiff's expert, Dr. Mark Cichon, D.O., executed the affidavit of merit with respect to standard of care. Dr. Cichon opined in his deposition that Perry was experiencing "compensated dehydration" when Dr. Hawley examined him in the ED on December 3. Dr. Cichon explained that when a patient becomes dehydrated, the body compensates for the dehydration by drawing on the body's reserve of fluid. Consequently, the patient may not exhibit signs of dehydration until the condition becomes severe. Infants do not have substantial reserves of fluid; therefore, an infant with diarrhea and vomiting can quickly become dangerously dehydrated. According to Dr. Cichon, the applicable standard of care for an emergency physician evaluating an infant with diarrhea and vomiting requires the physician to do more than check for external signs of dehydration. The physician must also obtain a detailed history, conduct an "oral challenge" to observe the infant's ability to retain fluids taken orally, and order laboratory tests. Dr. Cichon opined that Dr. Hawley failed to meet this standard of care.

Defendants moved to strike Dr. Cichon's expert testimony on the ground that his "theory" of "compensated dehydration" was not reliable under MRE 702 and MCL 600.2955. The trial court declined to hear the motion because it was filed after the cut-off date for

dispositive motions that had been established by the court's scheduling order. The trial court deemed defendants' motion to strike as a dispositive motion because striking Dr. Cichon's testimony would have been fatal to plaintiff's ability to present necessary expert testimony showing that the standard of care had been breached.

At trial, in addition to presenting Dr. Cichon's testimony, plaintiff presented the deposition testimony of Dr. Edward Terndrup, an expert that defendants had retained but decided not to call. Dr. Terndrup testified that several of the diagnostic measures that Dr. Cichon had stated were required by the applicable standard of care were not required, but he opined that employing these measures was "good clinical practice." The trial court denied defendants' motion for a directed verdict at the close of plaintiff's proofs. Defendants' expert witness, Dr. Marc Eckstein, testified that Dr. Hawley's evaluation of the child complied with the applicable standard of care. Dr. Eckstein rejected Dr. Cichon's opinion that an infant can be mildly or moderately dehydrated but not show physical signs. The jury returned a verdict in plaintiff's favor against Dr. Hawley in the circuit court action and the trial court awarded plaintiff judgment against U of M on her vicarious liability claim in the Court of Claims action. The trial court denied defendants' postjudgment motions for judgment notwithstanding the verdict (JNOV) or a new trial.

## II. MOTION TO STRIKE DR. CICHON'S EXPERT TESTIMONY

Defendants argue that the trial court erred in denying their pretrial motion to strike Dr. Cichon's expert testimony as unreliable. The trial court denied the motion on the ground that it was filed after the cut-off date for dispositive motions that was set forth in its scheduling order. Defendants deny that the motion was subject to the cut-off date for dispositive motions, and argue that the trial court should have considered the merits and granted the motion. "This Court reviews for an abuse of discretion a trial court's decision to decline to entertain motions filed after the deadline set forth in its scheduling order." *Kemerko Clawson, LLC v RXIV, Inc*, 269 Mich App 347, 349; 711 NW2d 801 (2005).

The trial court has authority to issue a scheduling order establishing cut-off dates for filing motions. MCR 2.401(2)(a)(*ii*). The trial court determined that defendants' motion to strike Dr. Cichon's testimony was a dispositive motion, which was therefore subject to the cut-off date of February 9, 2015, set forth in the scheduling order. The trial court concluded that the motion was dispositive because striking Dr. Cichon would have left plaintiff without necessary expert testimony to prove the standard of care element for medical malpractice.

"In a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995). "Failure to prove any one of these elements is fatal." *Id.* In a medical malpractice case, "[e]xpert testimony is required to establish the standard of care and a breach of that standard, as well as causation." *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012) (citations omitted). At issue in this case are the elements of proximate causation and breach of the standard of care. Plaintiff's theory was that the standard of care required Dr. Hawley to recognize that a physical examination might not reveal early signs of dehydration because the body compensates for dehydration by drawing on its fluid reserves. Therefore, Dr.

Hawley should have performed the oral challenge and checked the specific gravity of the child's urine, and should have ordered additional diagnostic tests, before deciding that oral rehydration was sufficient treatment. Plaintiff intended to support this theory of the standard of care through Dr. Cichon's testimony.

Defendants argue that plaintiff would still have been able to offer expert testimony in regard to the standard of care because plaintiff could elicit standard-of-care testimony from other expert witnesses. At the hearing, defendants suggested that plaintiff could elicit such testimony from Dr. Hawley on cross-examination, and could also use the recorded deposition of defendants' expert, Dr. Terndrup. Although plaintiff introduced Dr. Terndrup's deposition testimony at trial, that testimony did not go as far as Dr. Cichon's testimony in terms of identifying a standard of care consistent with plaintiff's theory of the case. Dr. Terndrup testified that although Dr. Hawley might have used additional diagnostic measures as a matter of "good clinical practice," he testified that these extra measures were not required by the standard of care. Defendants also argue that plaintiff could have introduced other aspects of Dr. Cichon's opinions that were not dependent on his compensated dehydration theory. However, defendants did not move to preclude only part of Dr. Cichon's testimony, but to strike him completely as plaintiffs' expert witness. Under these circumstances, the trial court's decision to regard defendants' motion to strike as a dispositive motion was justified.

Defendants argue that the trial court's obligation to act as a gatekeeper against unreliable expert testimony should trump enforcement of the scheduling order. Defendant cites *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004), for its statement that "the court *must* evaluate expert testimony under MRE 702 once that issue is raised." (Emphasis in original.) In *Craig*, the trial court "erroneously assigned the burden of proof under *Davis-Frye*[1] to defendant—the party *opposing* the admission of [the challenged expert's] testimony—and held that defendant was not entitled to a hearing because it failed to prove that [the expert's] theory *lacked* 'general acceptance.'" *Craig*, 471 Mich at 82 (emphasis in original). The Court's statement that the trial court "*must* evaluate expert testimony . . . once that issue is raised" addressed the trial court's erroneous conclusion "that it had no obligation to review plaintiff's proposed expert testimony unless defendant introduced evidence that the expert testimony was 'novel.'" *Id*. Our Supreme Court's statement in *Craig* does not negate other procedural rules. The trial court is required to act as a gatekeeper "to ensure that any expert testimony admitted at trial is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). However, "a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention[.]" *Craig,* 471 Mich at 82. By failing to timely raise the issue in accordance with the court's scheduling order, defendants failed to timely bring this matter to the trial court's attention. Accordingly, defendants' failure to timely invoke the trial court's gatekeeping obligation operated as a waiver of any claim of error related to the admissibility of the challenged testimony. The trial court did not abuse its discretion by declining to consider defendants' untimely motion.

---

[1] See *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

## III. PROXIMATE CAUSE

Defendants next argue that the trial court erred in denying their motions for a directed verdict or JNOV on the issue whether plaintiff failed to prove that Dr. Hawley's alleged negligence was the proximate cause of the child's death. We review de novo a trial court's decision to grant or deny a motion for a directed verdict or JNOV. *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 345; 871 NW2d 136 (2015); *Taylor v Kent Radiology, PC*, 286 Mich App 490, 499; 780 NW2d 900 (2009).

"Motions for a directed verdict or JNOV are essentially challenges to the sufficiency of the evidence in support of a jury verdict in a civil case." *Id.* "This Court reviews challenges to the sufficiency of the evidence in the same way for both motions; we review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Id.* (citation and quotation marks omitted). "Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id.* "If reasonable persons, after reviewing the evidence in the light most favorable to the nonmoving party, could honestly reach different conclusions about whether the nonmoving party established his or her claim, then the question is for the jury." *Id.* at 500.

A plaintiff claiming medical malpractice must prove that the patient "suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2) "In order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 496; 791 NW2d 853 (2010).

Proximate causation involves both "cause in fact" and "legal cause." *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). "Cause in fact" requires a showing that "but for" defendant's action, plaintiff would not have been injured, whereas "legal cause" focuses on foreseeability and whether a defendant should be held legally responsible for such consequences. *Id.* "A plaintiff must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." *Id.* "[A] plaintiff's prima facie case of medical malpractice must draw a causal connection between the defendant's breach of the applicable standard of care and the plaintiff's injuries." *Craig*, 471 Mich at 90. It is not sufficient for a plaintiff to proffer "a causation theory that, while factually supported, is, at best, just as possible as another theory." *Skinner,* 445 Mich at 164.

"As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of these injuries." *Craig*, 471 Mich at 87. As explained in *Craig*:

> It is important to bear in mind that a plaintiff cannot satisfy this burden by showing only that the defendant *may* have caused his injuries. Our case law requires more than a mere possibility or a plausible explanation. Rather, a plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he "set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." A valid theory of causation, therefore,

must be based on facts in evidence. And while "'[t]he evidence need not negate all other possible causes,'" this Court has consistently required that the evidence "'exclude other reasonable hypotheses with a fair amount of certainty.'" [*Id.* at 87-88.]

In *Teal v Prasad*, 283 Mich App 384; 772 NW2d 57 (2009), this Court emphasized that an expert opinion regarding causation that is "based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury." The plaintiff "must set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Id.* at 394-395 (citations and quotation marks omitted).

Defendants argue that plaintiff failed to prove a causal connection between Dr. Hawley's alleged breaches of the standard of care on December 3 and Perry's death on December 6. They argue that the absence of evidence regarding the interim period between these two dates, and the substantial evidence that an infant can progress from mild, to moderate, to severe dehydration in less than a day, precluded the jury from drawing an inference that Perry would not have died but for Dr. Hawley's negligence. They contend that plaintiff's causation theory is based on the logical fallacy of *post hoc ergo propter hoc*, in which it is irrationally inferred that where one event follows another, the first event caused the second. *Tipton v William Beaumont Hosp*, 266 Mich App 27, 37; 697 NW2d 552 (2005).

Defendants cite *Pennington v Longabaugh*, 271 Mich App 101; 719 NW2d 616 (2006). In that case, the defendant doctor performed a transesophageal echocardiogram on the decedent. Later the same day, the decedent presented with a perforated esophagus at a different hospital. She underwent surgery to repair the perforation. Several days later, she died from a stroke. *Id.* at 102-103. This Court noted that the plaintiff's expert "testified broadly that 'the cause of death is the complications related to her care following her perforated esophagus,' " but he admitted "that he could not testify about the medical probability regarding (1) what the cause of Mary's stroke was or (2) that an earlier diagnosis of Mary's perforated esophagus would have altered her outcome." *Id.* at 104-105. This Court concluded that the defendant was entitled to summary disposition because the expert's testimony failed to "establish a causal link between the alleged negligence and plaintiff's ultimate death." *Id.* at 105.

In *Teal*, 283 Mich App 384, another case cited by defendants, the plaintiff's decedent was involuntarily hospitalized following a suicide attempt. Although the decedent was initially uncooperative with the hospital staff, on the third day of his hospitalization he began to cooperate. He apologized for his lack of cooperation, and expressed his intent to resume taking his medication and attending Alcoholics Anonymous meetings. The defendant psychiatrist discharged the decedent on the fourth day. One week later, the decedent committed suicide. *Id.* at 387-388. The plaintiff alleged that the defendant negligently discharged the decedent from the hospital without adequate after-care plans although he was still at risk for suicide. *Id.* at 389-390. This Court affirmed the trial court's order granting summary disposition for the defendant because the decedent's suicide "was too remote in time, and likely too influenced by intervening factors, to establish a question of material fact regarding the causation element." *Id.* at 390. This Court noted that the decedent had indicated before his discharge that "he realized that suicide was not the answer to his problems," and that he expressed plans to receive treatment for mental illness and alcoholism and to reside with a family member. The plaintiff failed to present

evidence regarding the decedent's mental state and compliance with treatment during the week between his discharge and suicide. *Id*. at 393. The Court concluded that the plaintiff "failed to establish a reasonable inference, based on a logical sequence of cause and effect, that defendants' actions triggered the causal chain leading to Teal's suicide." *Id*. at 394.

Defendants also rely on *White v Hutzel Women's Hosp*, 498 Mich 881; 869 NW2d 275 (2015), which reversed this Court's decision in *White v Hutzel Women's Hosp*, unpublished opinion per curiam of the Court of Appeals, issued September 25, 2014 (Docket No. 304221). In *White*, the plaintiff mother alleged that the defendant practitioner negligently delayed delivering the plaintiff's infant by caesarian section. Fetal monitoring equipment detected "non-reassuring fetal heart tones" at 2:00 p.m., but the caesarian section was not performed until 5:00 p.m. According to plaintiff, "the failure to deliver the child by 2:00 p.m. caused him to have a hypoxic-ischemic event, which in turn led to asphyxia at delivery and resulted in the child's cerebral palsy." *White*, unpub op at 1-2. This Court rejected the defendant's argument "that the connection between defendant's alleged negligent conduct and the child's injuries is entirely speculative and therefore plaintiff cannot establish that defendant's conduct was the proximate cause of the child's injuries." *Id*., unpub op at 3. This Court held:

> Viewed in the light most favorable to plaintiff, evidence was presented that the standard of care required that the child be delivered no later than 2:30 p.m. because the sum of several factors indicated that the child was at risk of lack of oxygen (hypoxia) and blood flow (ischemia). One of the standard of care experts testified that no reassurance would have been able to be achieved after 2:00 p.m. Plaintiff's causation expert testified that the child's injuries occurred within the last hour of labor, sometime after 3:59 p.m., and that hypoxia caused the child to experience asphyxia at birth, which led to the child's cerebral palsy. Although defendant presented expert testimony offering a different explanation for the child's injuries, this testimony did not render plaintiff's evidence speculative. Because reasonable minds could differ regarding whether defendant's failure to perform a C-section resulted in the child enduring a prolonged labor during which the child experienced hypoxia that ultimately caused the child's injuries, the issue of proximate cause was properly left to the jury for a determination. [*Id*., unpub op at 3.]

Our Supreme Court reversed this Court's judgment and remanded the case to the trial court for entry of judgment in the defendant's favor on the ground that "the plaintiff's expert witnesses have failed to prove any causal connection between non-reassuring heart tones on the fetal heart monitor and the plaintiff's child's resultant cerebral palsy." *White*, 498 Mich at 881. The Court concluded that "[a]ny causal connection is speculative at best." *Id.*

Defendants also rely on *Dykes v William Beaumont Hosp*, 246 Mich App 471; 633 NW2d 440 (2001). In that case, the plaintiff's decedent was treated for leukemia in 1978. In August 1991, he developed symptoms of a respiratory infection, but he was allegedly misdiagnosed with recurrent leukemia. He was admitted to the defendant hospital in February 1992 and died in April 1992. In her malpractice action, the plaintiff alleged that the defendant "violated the standard of care by failing to perform a bronchoscopy or an open lung biopsy to identify the source of [the decedent's] respiratory problems and by failing to recognize that aggressive

antibiotic therapy was warranted." *Id*. at 474-475. The defendant moved for summary disposition, arguing that the plaintiff could not establish a genuine issue of material fact because her expert witness testified "that he could not state that the omitted treatments would have changed the outcome or prolonged [the decedent's] life. The defendant contended that the plaintiff "offered no evidence of causation beyond mere speculation and conjecture." *Id*. at 475-476. This Court noted that the expert contradicted his own affidavit of merit. Although he stated in the affidavit that the decedent "would have had a greater than fifty percent chance of surviving his infection" if the defendant complied with the standard of care, he testified in his deposition that there was "no way of knowing" whether the decedent would have lived longer if he received anti-pseudomonas medication in February. He also testified that he could not know what a bronchoscopy would have revealed, or whether it would have made any difference in the decedent's outcome. *Id*. at 477-479. This Court held that the expert's deposition testimony negated any inference of causation. *Id*. at 479. This Court further held that the plaintiff could not rely on the expert's affidavit to establish a question of fact for the jury regarding causation. *Id*. at 481-482.

The cases defendants cite involve temporal and causal connections that are more attenuated than the events relating to Perry's treatment on December 3 and death on December 6, 2010. In *Pennington*, the decedent was allegedly injured by a negligently performed procedure and died from a stroke several days later. *Pennington*, 271 Mich App at 102-103. In *Teal*, the decedent expressed his intent to cooperate with a treatment plan upon his discharge from a psychiatric hospital and committed suicide one week later. There was no evidence regarding the events of the intervening week. *Teal*, 283 Mich App at 393-394. In *White*, there was no firm connection between the occurrence of non-reassuring heart tones and the birth injury three hours later. *White*, 498 Mich 881. In the instant case, however, the evidence supports an inference of a direct connection between Dr. Hawley's alleged professional negligence and Perry's death. Perry presented in the ED with complaints of ongoing vomiting and diarrhea. According to plaintiff, Dr. Hawley should have, but failed to, apply additional diagnostic measures and make further inquiries into the child's history despite finding no signs of early dehydration. Perry died of dehydration three days later. Drs. Cichon and Terndrup testified that dehydration progresses within days or less in an infant. This supported an inference that Perry was in the early stages of dehydration on December 3, but Dr. Hawley failed to recognize this and advised Barker to take preventative steps of shorter feeding intervals and Pedialyte supplementation. The expert witness, Dr. Bader Cassin, opined that Perry's illness occurred over the period from December 1 or 2 to December 6, and that he was never properly hydrated during the 72-hour period from his discharge from the ED until his death. Because the process of dehydration was already beginning, these steps were inadequate, and Perry's dehydration worsened, causing death in three days.

Defendants argue that the evidence supported an inference that Perry, even if at risk for dehydration on December 3, was not yet dehydrated, or he had only mild dehydration on December 3. They contend that Dr. Hawley's diagnosis and recommendations were appropriate for Perry's condition on the morning of December 3, but his conditioned worsened after he left the ED, resulting in a progression of dehydration until his death on December 6. Moreover, because the experts agreed that dehydration can progress in days or less, the jury could have rejected that Perry was already in the mild/moderate stage of dehydration early in the morning of

December 3, and that his body was already drawing upon his limited fluid reserves, yet he survived until noon on December 6.

However, when evidence conflicts or there are alternative views of the evidence, the applicable standard of review requires that all inferences supported by the evidence be drawn in favor of the nonmoving party. *Taylor*, 286 Mich App at 499. Plaintiff's testimony regarding the course of Perry's illness weighs against the inference that Perry was not starting to dehydrate until after Dr. Hawley evaluated him. Barker testified that Perry had increasing diarrhea from December 1 to December 3. His first episode of projectile vomiting occurred on December 2, and the third on December 3. After he returned home, from December 3 to December 4, his vomiting and diarrhea were decreasing. On December 5, he did not vomit, and his diarrhea decreased. Barker testified that she was up all night with Perry from December 5-6, but she did not state that he was vomiting or moving loose stools. She stated, "All he wanted to do was whine. Like it wasn't an outburst cry. It was like a whimper." This course of events permitted the jury to conclude that Perry's fatal dehydration had already started before the morning of December 3. The jury could find that Perry's viral illness, although not completely resolved, did not start a new chain of events starting after Perry's ED presentation. The facts of this case are distinguishable from those in *Dykes*, 246 Mich App 471, in which the plaintiff's expert admitted that he did not know if timely diagnosis and treatment of the decedent's respiratory infection would have resulted in a more favorable outcome. Unlike the decedent in *Dykes*, Perry was not suffering from a complicated illness in which treatment options and their outcomes were uncertain. The expert witnesses generally agreed that proper rehydration by IV is the appropriate treatment for a dehydrated infant who cannot orally retain fluids. Under these circumstances, plaintiff's proof of causation was sufficient to support an inference that was not mere speculation. Accordingly, the trial court did not err in denying defendants' motions for a directed verdict and JNOV.

## IV. "GOOD CLINICAL PRACTICE" TESTIMONY AND ARGUMENT

Defendants next argue that the trial court erred by failing to exclude Dr. Terndrup's testimony about "good clinical practice." Defendants further argue that the trial court erred by denying their request for a special jury instruction informing the jury that Dr. Hawley was not liable for malpractice if he did not breach the standard of care, even if he failed to adhere to "good clinical practice." We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007). We review claims of instructional error de novo. *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 626; 792 NW2d 344 (2010).

Defendants argue that Dr. Terndrup's testimony about good clinical practice should have been excluded because it was not relevant to the question whether Dr. Hawley complied with the applicable standard of care. "Relevant evidence is evidence that has any tendency to make a fact of consequence more or less probable." MRE 401. Evidence is relevant and material if it is offered to prove or disprove a matter at issue in the case. The evidence need not directly prove or disprove an element of the plaintiff's claim to be material, it need only be a fact of consequence to the action. *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 731; 761 NW2d 454 (2008). Relevant evidence "may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." MRE 403.

In an action for medical malpractice, the plaintiff bears the burden of proving that "[t]he defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community . . . ." MCL 600.2912a(1)(b). "Professional negligence" or "malpractice" is defined as "the failure to do something which a [professional] of ordinary learning, judgment or skill . . . would do . . . ." M Civ JI 30:01. In this case, the parties disputed the applicable standard of care. Testifying on plaintiff's behalf, Dr. Cichon testified that an emergency physician evaluating an infant for dehydration must utilize several diagnostic measures beyond taking the child's history and physically examining the child. These additional measures included specific gravity testing of urine, measuring urinary output, and lab tests of blood and urine. Drs. Hawley and Eckstein testified that these additional measures are not part of the required standard of care. Dr. Terndrup agreed that these additional measures are not required by the standard of care, but he opined that it was "good clinical practice" to exceed the standard of care and utilize some of these additional measures. Dr. Terndrup's testimony was relevant to the parties' dispute regarding what measures were required by the standard of care. Although Dr. Terndrup did not agree with plaintiff's position on the standard of care, evidence that an emergency physician agreed that certain measures were valuable made it more probable than not that plaintiff held the correct position. We do not agree that Dr. Terndrup's testimony posed a danger of confusing the issues or misleading the jury regarding the standard of care. Dr. Terndrup's testimony clearly distinguished "good clinical practice" from the required standard of care. Accordingly, the trial court did not abuse its discretion in denying defendants' motion in limine.

We find no merit to defendants' contention that plaintiff's references to good clinical practice in her closing argument warranted a specific curative instruction to prevent the jury from confusing good or optimal practice with the legally required standard of care. Plaintiff's statement that she "could not possibly know that her sense of security . . . was not based on good clinical practice, which our expert says is in fact the standard of care," did not confuse the concepts of good clinical practice. The statement reflected plaintiff's position that the measures that Dr. Terndrup believed to be good clinical practice were measures that plaintiff's expert believed were required under the standard of care. Plaintiff further clarified the nuances of this argument by subsequently stating that Dr. Cichon "told [the jury] about the standards that are required in this case. They're the same thing that you heard from Dr. Terndrup, although he repeatedly characterized it as good clinical care." Furthermore, the jury was instructed that it must follow the trial court's instruction on the law, not the attorneys' statements and arguments on the law. Juries are presumed to follow their instructions. *Zaremba Equip, Inc v Harco Nat Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013).

Affirmed.

/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Henry William Saad

-10-