*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ZEGARY ALLEN,

        Plaintiff-Appellee,

v

JOYCE BOGAN,

        Defendant-Appellant.

UNPUBLISHED
April 15, 2026
12:33 PM

No. 369719
Genesee Circuit Court
LC No. 19-329068-DO

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Defendant appeals by right the Genesee Circuit Court's order dividing defendant's pension benefits and the equity in the marital home following the court's judgment of divorce that dissolved her marriage to plaintiff. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff and defendant married in 1992. When defendant accepted plaintiff's marriage proposal about a year and a half earlier, she believed that plaintiff made a good salary because plaintiff had told her that he was in charge of a $1 million budget as a bank's purchasing agent. At that time, defendant had a bachelor's and two master's degrees, and she earned about $40,000 to $50,000 as a special education teacher at a high school. During their engagement, plaintiff told defendant that he had filed for bankruptcy and did not have any credit. Defendant accepted this news because she knew that plaintiff had a good job, and plaintiff was "very evasive" about answering her questions about the implications of his bankruptcy. Plaintiff maintained at the bench trial[1] that he had filed for bankruptcy, even after defendant's counsel impeached that testimony with a certified record from the United States Bankruptcy Court of the Eastern District of Michigan showing that there was no history of bankruptcy proceedings in his name.

---

[1] The trial court held a bench trial on issues relating to property division. It later held a jury trial with respect to certain tort claims.

After their marriage in 1992, plaintiff moved in with defendant at a house that defendant already owned. In 1993, their son, Jameson Bogan, was born. In 1995, they moved into what then became the marital home. Plaintiff and defendant picked out the marital home together, and defendant used the proceeds from the sale of her previous house as a down payment. When they applied for a loan, defendant provided all her financial information, but plaintiff suddenly said, "just her," so the financing was only in defendant's name. When they had a meeting to sign the note for the mortgage, plaintiff again said, "just her," so only defendant signed the mortgage paperwork. Defendant made the mortgage payments exclusively from her own bank account, although plaintiff once contributed $800 toward a payment when defendant was temporarily out of work while recovering from a surgery. The mortgage was eventually paid off in 2017.

Plaintiff worked as a purchasing agent and later as a manager of a purchasing department for a bank, until the bank eliminated his position in 2000. The tax returns that he filed jointly with defendant showed that he made an average of about $50,000 per year in that position. He testified that he gave defendant unlimited access to write checks from his bank account for bills and other household expenses, but defendant testified that plaintiff would buy groceries when he got paid and that he then set a limit of between $400 and $600 that defendant was allowed to spend every two weeks. Defendant's paycheck offset the cost of utilities, food, clothing, gas, home maintenance, and part of Jameson's college expenses. When plaintiff lost his job, he received a severance payment of about $108,000, which was classified as a distribution from a retirement account on plaintiff's tax forms. Plaintiff put those funds into several different investment accounts, but Jameson testified that plaintiff told him that the investments "did not go well" and that he lost the money. By 2018, there was less than $10,000 remaining, and by the date of the bench trial in August 2022, there was nothing left. Defendant stated that plaintiff never told her about the $108,000 and that she first learned of it during the divorce. She signed the tax forms that reported the income, but she did not look at the numbers because she trusted plaintiff's statements that he did not receive any pension or severance payment.

After losing his job at the bank, plaintiff also recovered a settlement of about $30,000 to $50,000 from civil rights litigation, and he testified that he and defendant used about $5,000 from those funds to vacation in the Bahamas. Defendant testified that the trip to the Bahamas was a honeymoon funded by monetary gifts from their wedding guests, not from plaintiff's funds. But she did remember that plaintiff gave her $5,000 from those funds and that he paid for a different vacation, a family cruise for defendant, their son, and plaintiff's family. Plaintiff never told defendant what he did with the rest of the money.

Plaintiff eventually obtained new employment with Securitas Security Services as a security guard for General Motors. Defendant alleged that plaintiff wanted to seek unemployment benefits before he sought new work, but plaintiff denied that allegation and stated that he began work with Securitas immediately after losing his bank job. According to plaintiff, there were no job offerings for a purchasing agent, so he took the first job that he could find. His income as a security guard was only about half as much as what he had earned as a purchasing agent. Regardless of any changes in his income, defendant testified that plaintiff imposed the same limits on her spending from his account. Defendant expected plaintiff to only keep the security job until he could go back to banking, but plaintiff remained a security guard until he retired in 2012. Defendant said that plaintiff turned down any opportunity to work overtime and advised her and Jameson not to answer the phone if his work called.

Plaintiff testified that defendant encouraged the decision to retire, telling him to "quit that damn job" because they did not need to work after defendant was approved for social security disability benefits. But defendant stated that she would never have asked him to retire because "he was not holding up his end of the finances," and defendant had been working three jobs to make ends meet. As of the date of the bench trial, plaintiff's only income was about $20,000 per year from social security disability benefits. He expected to remain retired because he was 72 years old and had high blood pressure, "borderline diabetes," and arthritis. But his income was not enough to cover all his expenses, so he had to pay a lot of his bills with credit cards.

Defendant retired a few months before plaintiff in 2012, and her yearly income as of 2021 was about $68,000 from her social security and pension distributions. She did not want to retire because she was trying to help Jameson with college expenses, but she was forced into retirement after she had a stroke. She also had a medical history that put her at a high risk for an aneurysm, and there were other incidents before her retirement in which she experienced stroke-like symptoms. She testified that when she retired, she and plaintiff decided together that they would elect not to have surviving spouse benefits on her pension in exchange for a higher monthly payment because they needed more money to pay the bills.

On March 6, 2018, defendant discovered that one of the family dogs was critically ill. Defendant, plaintiff, and Jameson took the dog to the emergency veterinarian. When defendant checked into the office, she learned that she was approved for a $4,000 line of credit for veterinary expenses. Plaintiff misunderstood this to mean that defendant was about to pay $4,000 for the dog's treatment, and he began yelling and cursing at defendant. Defendant tried unsuccessfully to explain that she was not accepting the credit and that the actual bill was only about $570, which she paid with a check. They returned home after the dog was treated and released. Later that evening, Jameson used his phone to record audio from an incident in which plaintiff launched into an expletive-filled tirade against defendant for more than 10 minutes. Plaintiff repeatedly threatened to kill the family dogs and "blow their motherf***ing brains out." He searched through his closet for a gun, which defendant had secretly removed over a year before out of fear that plaintiff would use it one day. Jameson described plaintiff's behavior as different from "ranting or throwing a tantrum." It was an ongoing issue throughout the marriage, and incidents reaching that level of intensity occurred about "once a week."

In September 2018, defendant obtained a personal protection order (PPO) against plaintiff that prohibited him from harming defendant or her dogs. Plaintiff moved out of the marital home that same month. Defendant originally filed for divorce in May 2019, but she voluntarily dismissed the case after suffering a mental breakdown. On the same day that she dismissed the action, plaintiff filed for divorce to initiate this case. In her answer, defendant counter-claimed in part for an annulment, contending that the marriage was based on fraud. The counterclaim also included counts for intentional infliction of emotional distress (IIED) because of plaintiff's physical and emotional abuse throughout the marriage, as well as assault and battery because plaintiff allegedly raped her on two occasions between their separation and divorce. Defendant's counterclaim also requested that if the court divided defendant's pension, then plaintiff's share should be offset by the amount of plaintiff's pension "that he would have earned had he regained gainful employment as he should have, instead of settling for the lesser paying job of Security Guard for 13 years."

The trial court, with Judge Michael J. Theile then presiding over the case, held that defendant's annulment/fraud claim should be heard with the rest of the divorce case because the alleged fraud would be relevant to the issue of fault in the case in chief, but it bifurcated the IIED and assault-and-battery claims for a separate jury trial. The case was later reassigned to Judge B. Chris Christenson, who entered a consent judgment of divorce that addressed the division of assets that are not at issue in this appeal.

In 2021, defendant unilaterally took out another $40,000 mortgage loan on the marital home. She used about half of that money to pay for various household improvements, including repairs to the roof, chimney, sump pump, and bathroom floor; the installation of a new patio door, windows, and toilets; and the removal of several trees on the property. She kept the other half of the money in a savings account for future repairs or other needs.

In 2022, the trial court held a bench trial to determine the division of the marital home and defendant's pension. The parties stipulated that the value of the marital home was $225,000 and that the home that the parties lived in from 1992 to 1995 was defendant's premarital property. Plaintiff also made an oral motion for spousal support on the basis of the disparity of income between plaintiff and defendant. The trial court held that plaintiff's alleged underemployment was not a significant factor to consider under *Sparks v Sparks*, 440 Mich 141; 485 NW2d 893 (1992), and that it did not matter whether the underemployment was voluntary because "[t]hey stayed together as a couple for 20 years after that." Aside from that, the trial court made no significant findings of fact or conclusions of law because it reserved its opinion until the jury trial on the tort claims was concluded.

In October 2022, plaintiff filed a motion in limine to limit the scope of the testimony to be allowed at the upcoming jury trial on the tort claims. Plaintiff argued that, in accordance with the statute of limitations for defendant's tort claims and the doctrine of laches, the trial court should only allow testimony about events occurring within a certain number of years from the filing of defendant's counterclaim. Plaintiff also requested to limit any testimony regarding any alleged "economic exploitation" in the relationship because those allegations could not support an IIED claim. Defendant argued that plaintiff should have raised the affirmative defenses of statute of limitations and laches with his initial response to her counterclaim and that economic exploitation was a well-established form of spousal abuse that constituted IIED. In response, plaintiff requested leave to amend his pleadings to assert the statute of limitations and laches as affirmative defenses.

After a hearing, the trial court granted the motion in limine and ordered that testimony at the jury trial relating to the IIED claim would be limited to events occurring no more than three years before the filing of the counterclaim, MCL 600.5805(2), and that testimony relating to the assault and battery claim would be limited to events occurring no more than five years before the filing of the counterclaim, MCL 600.5805(4). It allowed plaintiff to amend his pleadings to include the statute of limitations as an affirmative defense. The order also barred defendant from arguing that plaintiff's economic exploitation factored into her IIED claim because it concluded that financial issues can never be the basis for an IIED claim. The trial court also held that defendant's allegations regarding the economic exploitation did not support an independent claim of fraud.

In January 2023, the case was reassigned to Judge Khary L. Hanible because Judge Christenson was reassigned to a different court and was no longer in the family division. During a pretrial hearing in February 2023, plaintiff requested that the case be returned to Judge Christenson, arguing that the same judge should preside over the bench trial and the jury trial and make the factual determinations for the property division, especially regarding the issue of fault. Judge Hanible explained that Judge Christenson had wanted to keep this case on his docket after his reassignment, but that Chief Judge David J. Newblatt indicated that Judge Christenson was not allowed to keep the case under MCR 8.111. Judge Hanible stated that the trial court would "do whatever Chief Judge Newblatt orders it to do" regardless of the parties' positions on the matter.

By the time of the jury trial in October 2023, Judge Hanible was still the judge presiding over the case. One of defendant's witnesses was an expert in advocacy for victims of domestic violence. She testified about a "power and control wheel," which was a diagram used in her professional community to educate others about the various tactics that abusers may use to exert power over their partners in an abusive relationship. The power and control wheel diagram showed a wheel with eight colored "spokes" explaining eight abuse tactics, including Using Coercion and Threats; Using Intimidation; Using Emotional Abuse; Using Isolation; Minimizing, Denying, and Blaming; Using Children, Using Privilege, and Using Economic Abuse. Because of the trial court's order barring any argument regarding economic exploitation, defendant offered as an exhibit a redacted version of the power and control wheel that did not include the "Economic Abuse" section, and her expert witness did not testify about that section.

After hearing the case, the jury returned a verdict finding plaintiff liable only for two claims: IIED regarding his threat to kill the family dogs on March 6, 2018, and IIED regarding his treatment of plaintiff from August 27, 2016 until the day that he moved out of the marital home. It awarded defendant $11,520 for each IIED claim, for a total award of $23,040. The jury found plaintiff not liable on the assault-and-battery claims or the IIED claims regarding the two alleged rapes. The trial court entered a judgment in accordance with the jury verdict.

Several months after resolving the tort claims, Judge Hanible issued an opinion and order regarding the distribution of marital property "by reviewing the prior bench trial, all relevant evidence, and considering the jury's verdict on the tort claims." Citing *Sparks*, 440 Mich at 151-160, the trial court considered the duration of the marriage, the parties' contribution to the marital estate, the parties' ages, health, life statuses, necessities, earning abilities, and past conduct or marital fault. It rejected defendant's argument that plaintiff had an equal or higher earning ability compared to her because he remained voluntarily underemployed after losing his banking job in 2000, focusing instead on the parties' earning abilities as of the date of the divorce, when they were both retired. On the basis of the testimony at the bench trial, it found that "the parties had an informal cost sharing arrangement when it came to marital expenses," in which plaintiff contributed to bills and expenses in an amount that may have been "less than his fair share," but was not so little as to justify severely reducing or eliminating his share of the marital estate.

The trial court also took judicial notice of the jury's verdict on the tort claims for the purpose of its consideration of marital fault, and it also considered defendant's allegations of economic exploitation that were previously barred in the jury trial. It ultimately concluded that plaintiff's conduct led to the breakdown of the marriage, noting that plaintiff was the main perpetrator of the verbal and emotional abuse in the marriage and that defendant prevailed on IIED

claims against plaintiff. The court stated that it did not consider the general principles of equity, but it did not explain why it had not.

On the basis of those findings, the trial court held that plaintiff and defendant were each entitled to half of the equity in the $225,000 marital home, but their recovery was to be adjusted by the $23,040 jury verdict on the IIED claims, so plaintiff would receive $89,460, and defendant would receive $135,540. The court also rejected defendant's argument that plaintiff's share of her retirement pension should be adjusted based on her calculation of what plaintiff hypothetically could have earned had he made wiser investments with his own pension. The court noted that under MCL 552.18(1), all retirement benefits accrued during the marriage were marital assets subject to division, and it declined to use any alternate calculations or otherwise speculate about the present value of the money that plaintiff allegedly squandered. The court also denied plaintiff's oral motion for spousal support. This appeal followed.

## II. JUDGE REASSIGNMENT

Defendant first argues that the trial court erred because the judge who issued the final order in this case had not presided over the trial proceedings in the property-disposition phase of the case. We disagree.

## A. STANDARD OF REVIEW

A trial court's decision to reassign a case is reviewed for an abuse of discretion, but whether the court complied with the applicable court rules during that transition is reviewed de novo. *Nat'l Waterworks, Inc. v Int'l Fidelity & Surety, Ltd.*, 275 Mich App 256, 258; 739 NW2d 121 (2007). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the principled range of outcomes." *Id*.

## B. ANALYSIS

If a judge leaves the family division, then the circuit's "family court plan" may dictate the assignment of his pending cases:

> [I]n each judicial circuit, the chief judge and the chief probate judge or judges shall enter into an agreement that establishes a plan known as the "family court plan" that details how the family division will be operated in that circuit . . . .
>
> * * *
>
> (5) A family court plan . . . may provide that when a judge's service pursuant to the family court plan ends, the pending cases of that judge are *to be reassigned to another judge* or judges serving pursuant to the family court plan or *are to be resolved by that judge*. [MCL 600.1011(1), (5).]

In other words, pending cases may stay with the same judge *or* be reassigned to a successor. The chief judge and chief probate judge may agree to cement their decision in advance by including a

provision in the family court plan, but they are not required to do so.[2] If a case is reassigned to a successor judge, then the successor judge *must* be assigned any pending matters, MCR 8.111(C), and the "successor judge has the authority to enter whatever orders his or her predecessor could have entered," *Dutton Partners, LLC v CMS Energy Corp*, 290 Mich App 635, 641 n 2; 802 NW2d 717 (2010).

Defendant contends that a successor judge who did not preside over the bench trial could not possibly determine the division of a marital estate without violating MCR 2.517 because the judge could not "actually hear the evidence, judge the credibility of the witnesses, [and] weigh testimonial evidence consistent with law to arrive at an equitable decision." MCR 2.517 requires the trial court to create a record of its findings of fact and conclusions of law that support its judgment:

> (1) In actions tried on the facts without a jury or with an advisory jury, the court shall find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment.

> (2) Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without over elaboration of detail or particularization of facts.

> (3) The court may state the findings and conclusions on the record or include them in a written opinion. [MCR 2.517(A)(1), (2), and (3).]

We fail to see why MCL 600.1011(5) would authorize reassigning cases to a successor judge and why MCR 8.111(C) would require the successor judge to take on any pending matters if doing so would necessarily result in a violation of MCR 2.517. Nothing in MCR 2.517 prevents a judge from drawing factual conclusions without the benefit of first-hand observations at trial. It also does not require the court to meticulously comb through every shred of evidence and present a flawless recitation of all facts. Judge Hanible's written opinion complied with MCR 2.517: it stated the trial court's legal conclusions from *Sparks* and other relevant caselaw, made specific findings of fact, applied those facts to the law, and then ordered a division of assets consistent with the opinion's reasoning. We also note that the trial court ordered the division of assets about a year and a half after the bench trial. Under the circumstances, we doubt that Judge Christenson's recollection of the bench trial would have been substantially more accurate than Judge Hanible's review of the record. To the extent that Judge Hanible's findings of fact may have been faulty, we review those findings for clear error as in any other divorce appeal. See *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990). But the reassignment alone does not justify reversal.

---

[2] The Genesee Circuit Court's family court plan did not address whether pending cases would be reassigned to another judge or resolved by the same judge until its 2025 amendment, in which it required pending cases to be transferred to the successor judge. 7th Circuit Local Administrative Order P25 2025-02J, p 6. Before then, the chief judge presumably could allow a judge to resolve a pending case unless doing so was barred under other law.

## III. MOTION IN LIMINE

Next, defendant argues that the trial court abused its discretion when it granted defendant's motion in limine to limit testimony regarding the tort claims. We disagree with respect to the trial court's limitation of the testimony to events occurring within the applicable statutes of limitation. We agree that the court erred by excluding evidence of plaintiff's economic exploitation, but we hold that the error was harmless.

### A. STANDARD OF REVIEW

"A trial court's decision on a motion in limine is reviewed for an abuse of discretion. However, to the extent the decision involves the proper application of legal principles, that aspect of the decision is reviewed de novo." *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 347 Mich App 533; 15 NW3d 356 (2023). The trial court's decision to permit a party to amend its pleadings is also reviewed for an abuse of discretion. *In re Kostin*, 278 Mich App 47, 51; 748 NW2d 583 (2008). We review the decision to admit or exclude evidence for an abuse of discretion, but errors in that regard "will not merit reversal unless a substantial right of a party is affected, MRE 103(a), and it affirmatively appears that the failure to grant relief is inconsistent with substantial justice, MCR 2.613(A)." *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 729; 761 NW2d 454 (2008).

### B. TIMELINESS

Contrary to defendant's assertion, plaintiff's motion in limine was not untimely. And although there were some procedural defects in his request to assert the statute of limitations and laches as affirmative defenses, the trial court did not abuse its discretion by granting it.

At any time during a civil case, a trial court may enter a scheduling order that establishes a timeline for the case, including the date of trial and the deadlines for new pretrial motions and amendments of pleadings. MCR 2.401(B)(2)(a). When developing the schedule, the trial court must "take into consideration the nature and complexity of the case." MCR 2.401(B)(2)(b). In this case, the scheduling order stated "that any motion in limine [must] be filed and heard no later than two (2) weeks prior to the hearing date." At the time that plaintiff filed his motion in limine on October 18, 2022, the jury trial was scheduled for October 20, 2022. But the trial was adjourned (per the jury board), and the trial court then set a hearing for plaintiff's motion in limine. The hearing on the motion occurred on November 21, 2022, about 11 months before the date of the rescheduled jury trial on October 19, 2023. Therefore, the motion in limine was "filed and heard" long before the scheduling order's two-week deadline, so it was not untimely on that basis.

But plaintiff's motion in limine effectively asserted an affirmative defense contending that defendant's counterclaim could not challenge plaintiff's actions occurring early in the parties' marriage because they would be barred by the applicable statutes of limitation, which rendered any testimony regarding those events irrelevant and inadmissible. Affirmative defenses come with their own set of deadlines. They "must be stated in a party's responsive pleading, either as originally filed or as amended . . . ." MCR 2.111(3). Any affirmative defense not included in the responsive pleading is waived. *Stanke v State Farm Mut Auto Ins* Co, 200 Mich App 307, 312; 503 NW2d 758 (1993). A party may amend a pleading within 14 days of service or receiving a

required response, but outside of that window, the "party may amend a pleading only by leave of the court or by written consent of the adverse party. Leave shall be freely given when justice so requires." MCR 2.118(A)(1)-(2).

That rule creates a strong preference toward allowing parties to amend their pleadings. "Leave to amend should ordinarily be denied only for particularized reasons such as undue delay, bad faith or dilatory motive, repeated failures to cure by amendments previously allowed, or futility." *In re Kostin*, 278 Mich App at 52. Delay alone does not warrant denial of the request; there must be some additional evidence of bad faith or actual prejudice to the opposing party. *Lane v KinderCare Learning Ctrs, Inc.*, 231 Mich App 689, 697; 588 NW2d 715 (1998). When a party orally requests to amend the pleadings, he must also offer the proposed amendment in writing. *Twp of Grayling v Berry*, 329 Mich App 133, 151-152; 942 NW2d 63 (2019). The trial court may also amend the pleadings sua sponte "for the furtherance of justice, on such terms as are just, at any time before judgment rendered therein. The court at every stage of the action or proceeding shall disregard any error or defect in the proceedings which do not [sic] affect the substantial rights of the parties." MCL 600.2301.

Considering the trial court's broad discretion to allow amendments of the pleadings and its interest in managing the quantity of evidence presented at trial, we hold that the court did not abuse its discretion when it granted plaintiff's motion in limine to the extent that it requested the court to limit testimony regarding events occurring before the statutory period of limitations. Plaintiff did not request to amend his pleadings until he made an oral motion at the hearing on the motion in limine, and he did not present the court with the proposed amended pleadings in writing. The trial court could have properly denied the motion to amend the pleadings on that basis and held that plaintiff had waived any argument relating to the statute of limitations or laches. See *Berry*, 329 Mich App at 152. But the court had a compelling reason to grant the request despite its procedural defects. If it did not impose some limitation on the testimony at trial, then the parties would be free to inquire into *28 years* of marital history, which would result in a lengthy trial rife with cumulative and irrelevant evidence. The trial court was justified in its decision to spare the jury from that experience and to facilitate the efficient resolution of this case, which had already dragged on for over three years.

Granting the motion in limine also did not prejudice defendant or otherwise affect her substantial rights. Defendant stated at the motion hearing that the assault and battery claims extended only to the two alleged rapes in 2018, which undisputedly fell within the statute of limitations. Although defendant asserted that the IIED claim stemmed from an abusive "pattern throughout the entire marriage," the trial court's decision to allow plaintiff to assert a statute-of-limitations defense did not affect defendant's substantial rights because it could have imposed the same limitations on the testimony in other ways, either by amending the pleadings sua sponte, see MCL 600.2301, or by excluding the evidence on the basis that any probative value of testimony regarding events earlier in the marriage would be substantially outweighed by the danger of prejudicing plaintiff, further delaying the proceedings, wasting time, and needlessly presenting cumulative evidence, see MRE 403. Under these circumstances, the trial court's decision to grant the request to limit the testimony fell within a principled range of outcomes and was not an abuse of discretion.

## C. STATUTE OF LIMITATIONS

Defendant attempts to argue that the trial court applied the incorrect statute of limitations to the assault and battery claims, but she has not properly raised that issue on appeal.

In her brief's statement of the questions involved in this appeal, defendant used a heading that suggested that "the trial court erred as a matter of law in applying the incorrect statute of limitations of five (5) years to [defendant]'s non-consensual sex claims framed as assault and battery claims" in part because "the applicable statute of limitations is ten (10) years . . .". But the corresponding section of her argument states that the trial court erroneously applied a two-year statute of limitations and that the proper statute of limitations is five years under MCL 600.5805(4), which sets a five-year statute of limitations "for an action charging assault or battery brought by a person who has been assaulted or battered by his or her spouse or former spouse, an individual with whom he or she has a child in common, or a person with whom he or she resides or formerly resided."

As previously explained, the trial court's order imposed a five-year statute of limitations under MCL 600.5805(4), so defendant mischaracterized the court's holding in the argument section of her brief. Her heading in the statement-of-questions section properly states the court's holding but does not explain why she believed that a 10-year statute limitation was more appropriate. Because the only part of defendant's argument that was supported by legal authority and reasoning agrees with the trial court's holding, we decline to address whether the statute of limitations for defendant's assault and battery claims is 2, 5 or 10 years. See *People v Wilson*, 196 Mich App 604, 616 n 11; 493 NW2d 471 (1992) (refusing to consider an argument that a party merely suggested in a heading without a corresponding argument in the body of the brief). See also *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992) ("A party may not merely announce his position and leave it to us to discover and rationalize the basis for his claim."). Defendant does not challenge the trial court's application of a three-year period of limitations for her IIED claim, so we also leave that holding undisturbed.

## D. ECONOMIC ABUSE AS IIED

Defendant next argues that the trial court abused its discretion when it limited testimony of plaintiff's alleged economic exploitation on the basis that financial issues could not support an IIED claim. We agree with defendant that the trial court erred in this regard but hold that the error was harmless in light of the three-year statute of limitations for the IIED claim.

An IIED claim requires "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v Allstate Ins Co*, 262 Mich App 571, 577; 686 NW2d 273 (2004) (quotation marks and citation omitted). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v Mills*, 212 Mich App 73, 91; 536 NW2d 824 (1995). Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hayley*, 262 Mich App at 577 (quotation marks and citation omitted). The trial court initially determines whether the defendant's conduct was sufficiently extreme and outrageous, but if reasonable minds may differ, then the jury must decide that question. *Id*.

It is well settled that "[t]he mere failure to pay a contractual obligation, without more, will not amount to outrageous conduct for purposes of this tort." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 605; 374 NW2d 905 (1985). See also *Hayley*, 262 Mich App at 577 ("The failure to pay a contractual obligation or insurance benefits does not amount to outrageous conduct, even if it is done in bad faith or wilfully."). In *Roberts*, 422 Mich at 599, the plaintiffs argued that their auto insurer's failure to pay certain no-fault benefits constituted IIED because the auto insurer caused a significant administrative delay in processing the plaintiffs' claim for benefits, which caused them emotional distress. Our Supreme Court noted that "in a contractual setting, a tort action must rest on a breach of duty distinct from contract," and it held that failure to pay a contractual obligation, standing alone, is not "extreme and outrageous" for the purpose of an IIED claim. *Id*. at 603, 605. Furthermore, "an insurer's request for verification of claims, in the absence of evidence of harassment or similarly egregious conduct, falls short of conduct which we would consider tortiously outrageous." *Id*. at 605 (quotation marks and citation omitted).

The trial court erroneously interpreted *Roberts* to reach the conclusion that testimony regarding plaintiff's alleged economic exploitation "shall not be heard by the jury in attempt to support an [IIED] claim" because economic exploitation or the failure to fulfill a financial obligation "can never be a basis for such claim." But the *Roberts* court did not state that financial malfeasance is *never* relevant to an IIED claim—it explicitly acknowledged that additional evidence of "egregious conduct" might qualify as "extreme and outrageous." *Id*. *Roberts* is also clearly situated in the context of contractual relationships with an insurer. No case has extended that concept to an IIED claim against a plaintiff's spouse, and we decline to do so here.

There is a significant difference between an insurance company's refusal to pay contractual benefits and the type of economic exploitation that defendant alleged in her IIED claim. This case does not involve a formal contract for plaintiff to pay for certain household expenses. In a marriage, such contractual obligations rarely exist. Instead, there is often a loose practical or moral expectation that the spouses must provide for one another, financially or otherwise. Unlike an arms-length transaction between unrelated parties, the financial relationship between spouses may be inextricable from their social and emotional relationship. A person's influence over his spouse's finances may vary between couples, ranging from zero influence to complete control. Under some circumstances, a person could wield that influence over the spouse in a manner that goes "beyond all possible bounds of decency" and is "atrocious and utterly intolerable in a civilized society," *Hayley*, 262 Mich App at 577, especially when combined with other evidence of emotional or physical abuse that is tortiously outrageous.

The trial court abused its discretion when it denied plaintiff the opportunity to present testimony about plaintiff's alleged economic abuse. It failed to recognize the difference between a simple breach of contract and the financial control that domestic abusers may exert over their partners. For similar reasons, it also abused its discretion when it ordered defendant to redact the "Economic Abuse" section of defendant's "Power and Control Wheel" exhibit. The unredacted exhibit could have helped the jury to understand how economic abuse may form part of a broader attempt to establish and maintain an abusive relationship, which in turn could have helped the jury to determine a benchmark for "extreme and outrageous" conduct or to establish a causal connection between any alleged economic abuse and defendant's emotional distress. The full exhibit was relevant and probative, and it should have been admitted without redaction. See *People v Bulmer*,

-11-

256 Mich App 33, 35; 662 NW2d 117 (2003) ("Demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case.").

However, considering the three-year statutory period of limitations for defendant's IIED claim, the trial court's error was harmless. Defendant commenced the tort action in August 2019. Therefore, testimony was allowed only for events occurring no earlier than August 2016. But the bulk of the alleged economic exploitation in this case occurred long before 2016. Plaintiff's dishonesty about filing for bankruptcy occurred in the 1990s, his alleged misuse of his retirement payout was in the early 2000s, and his alleged voluntary underemployment was before his retirement in 2012. The only evidence of possibly financially abusive conduct occurring after 2016 was the testimony from the bench trial regarding plaintiff's ongoing limitations on the money that defendant could spend from his bank account for household expenses. A $1,000 monthly limit after household groceries might be unfair, but no reasonable person would consider it "extreme and outrageous," especially considering that plaintiff was only controlling the use of funds from his own individual account. At most, it was an indignity or "petty oppression." See *Doe*, 212 Mich App at 91. Furthermore, the jury had already awarded defendant $23,040 in total damages for plaintiff's threat to kill the family dogs and his treatment of defendant from August 27, 2016 until the day that he moved out of the marital home. Additional evidence of plaintiff's budgeting restrictions would not have significantly changed this recovery. Accordingly, the trial court's error does not justify reversal because it did not affect defendant's substantial rights.

## IV. *SPARKS* FACTORS

Regarding the trial court's final order distributing the marital assets, defendant argues that the court erroneously failed to consider certain contributions to the marital estate and the general principles of equity when it determined an equitable property distribution under *Sparks*.[3] We disagree.

## A. STANDARD OF REVIEW

In an appeal involving the division of marital assets, we review the trial court's findings of fact for clear error, and then we determine "whether the dispositive ruling was fair and equitable

---

[3] Defendant also stated in a subheading of her brief, "By stating that 'This weighs against an award of spousal support' reveals that the factor of 'fault' was considered only with regard to the issue of 'spousal support' and not as to the Sparks factor of 'contribution' to the entire marital estate." We reject this argument to the extent that it might be considered a challenge to the trial court's consideration of the "fault" or "past conduct" factor under *Sparks*. That part of the heading is not supported by any argument in the body of the brief. See *Wilson*, 196 Mich App at 616 n 11. Furthermore, the trial court's opinion dedicated much analysis to the fault factor, accounting for both the jury trial verdict and additional allegations of "financial exploitation," noting that evidence excluded from the jury trial (relating to the tort claims) could properly be considered in the property division phase. "Past conduct" and "contributions" are distinct factors under *Sparks*, 440 Mich at 159-160, so the trial court did not err by reorganizing defendant's "economic exploitation" claims as arguments relating to fault, contribution, or earning ability.

-12-

in light of those facts." *Sparks*, 440 Mich at 152. Reversal is only required if we are "left with the firm conviction that the division was inequitable." *Id*.

Whether the division of property was equitable is determined by the relevant circumstances:

[T]he following factors are to be considered wherever they are relevant to the circumstances of the particular case: (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. There may even be additional factors that are relevant to a particular case. . . . The determination of relevant factors will vary depending on the facts and circumstances of the case. [*Id*. at 159-160 (citation omitted).]

Not every *Sparks* factor will be relevant or afforded equal weight in every case. *Id*. at 159. The division of assets need not be equal, but it should be "roughly congruent," and the trial court must explain "any significant departures from congruence." *McNamara v Horner*, 249 Mich App 177, 188; 642 NW2d 385 (2002).

## B. CONTRIBUTION

### 1. PLAINTIFF'S SEVERANCE/RETIREMENT FUNDS

According to defendant, the trial court's decision to award plaintiff half of defendant's pension was inequitable because plaintiff concealed and wasted most of his own retirement funds. We disagree.

A party's attempt to conceal assets during the marriage or during the divorce proceedings is relevant to the determination of an equitable division under *Sparks*, "but it is only one of many facts that the court must weigh. Further, a judge's role is to achieve equity, not to 'punish' one of the parties. An attempt to conceal assets does not give rise to an automatic forfeiture." *Sands v Sands*, 442 Mich 30, 36; 497 NW2d 493 (1993). For example, in *Hodge v Parks*, 303 Mich App 552, 563; 844 NW2d 189 (2014), a plaintiff took out a $50,000 loan to make a down payment on a condominium for her sons, which she repaid with money that she earned during her marriage. The defendant argued that the plaintiff had attempted to conceal that purchase from him, but this Court held that the dishonesty did not require the defendant to receive a larger share of the marital assets because the defendant himself had "engaged in similar deceptive behavior regarding other assets." *Id*. at 564.

Defendant first contends that the trial court erroneously classified the $108,000 payment that plaintiff received upon losing his banking position as an employee "buyout" instead of "retirement funds" as they were described in the parties' tax returns, but the difference is irrelevant

in this case.[4] By the time of the bench trial to determine property distribution, there was nothing left of those funds to distribute. Whether the funds were a marital asset because they were a severance payment, see *Lee v Lee*, 191 Mich App 73, 79; 477 NW2d 429 (1991), or a mixture of marital and separate assets in the form of premarital and postmarital contributions to a retirement account, see *McNamara*, 249 Mich App at 187, is therefore irrelevant. And the distinction is irrelevant to the contribution factor under *Sparks*. Regardless of whether the funds were a severance payment or a retirement distribution, the allegation remains that plaintiff received a windfall of money that he concealed from his wife and did not contribute to the household.

But the record does not strongly support that allegation. Defendant testified that plaintiff never told her about the funds and that he denied receiving a pension after losing his job. But the money was properly reported on their joint tax returns, and there was no evidence that plaintiff was not forthcoming with that information during the divorce proceedings. The trial court made no specific factual findings about whether plaintiff concealed the funds, but it did acknowledge the conflicting testimony about whether those funds were contributed to the marital estate, noting that "Plaintiff claimed the buyout money went towards marital expenses while Defendant claimed it was squandered on poor investments." The court refused to adopt either position because "[e]ither way, the money does not exist today, and the Court is not able to go back in time to 2000 and re-think Plaintiff's money management." In light of the parties' conflicting testimony and the lack of evidence from more neutral sources, we hold that the trial court's position that the evidence was inconclusive regarding plaintiff's contribution of the $108,000 to the marital estate was not clearly erroneous.

Even if plaintiff truly did waste the funds on poor investments as defendant claims, that would not entitle her to a larger share of the marital estate. This Court has previously upheld a trial court's decision not to penalize a party even when he *deliberately* attempted to deflate the value of his stock a month before his divorce trial and admitted that the decision was partly motivated by the impending divorce. *Hanaway v Hanaway*, 208 Mich App 278, 284-285, 298; 527 NW2d 792 (1995) (holding that the party's conduct did not require an automatic sanction, even though the deflated value of the stock was more than $500,000 less than the original value). Defendant never claimed that plaintiff deliberately sabotaged his investments. To award defendant an additional share of the marital estate based on what plaintiff's investments hypothetically *should have* earned would unjustly punish plaintiff for his poor personal finance skills. In any event,

---

[4] Defendant contends that plaintiff withdrew funds from his retirement account without the spousal notification and consent required by the Employee Retirement Income Security Act and the Retirement Equity Act of 1984. Although she did not cite any particular statutory provision, she appears to be referring to 29 USC 1055, which provides that payable retirement benefits are "provided in the form of a qualified joint and survivor annuity," but the employee can waive that requirement if he obtains his spouse's written consent. 29 USC 1055(a)(1), (c)(1)(A)(*i*), and (c)(2)(A)(*i*). The $108,000 was generally marked as coming from some sort of retirement fund on the parties' tax returns, but plaintiff offers no way to determine from the evidence whether the $108,000 was subject to that statute in the first place, let alone whether plaintiff's receipt of the funds complied with the statute.

-14-

defendant presented no evidence of the mathematical calculations needed to reasonably estimate two decades of smarter investments.[5]

Furthermore, defendant accuses plaintiff of "looting" his retirement account, but defendant arguably also "looted" marital assets. In July 2021, she unilaterally took out a $40,000 mortgage on the marital home and kept half of those funds in a personal account. She was arguably engaged in similar behavior as plaintiff, see *Hodge*, 303 Mich App at 563, but the trial court awarded her half of the equity in the marital home without ever mentioning the new mortgage. It would be unfair to penalize plaintiff for wasting money long before the parties ever contemplated divorce but overlook defendant's decision to encumber marital assets while the divorce was pending. On the whole, we are not convinced that the trial court's failure to adjust the division of assets to account for plaintiff's use of the funds that he received after his banking position was terminated.

## 2. VOLUNTARY UNDEREMPLOYMENT

The trial court did not abuse its discretion when it refused to reduce plaintiff's share of the marital estate to compensate for his alleged voluntary underemployment because that underemployment had little impact on his contributions to the marital estate.

A trial court may explicitly consider a spouse's voluntary underemployment for the purpose of imputing income to the spouse to determine an appropriate child-support award, *Stallworth v Stallworth*, 275 Mich App 282, 284-285; 738 NW2d 264 (2007), but there is a much less direct relationship between underemployment and the division of marital assets. Notably, plaintiff's underemployment from 2000 to 2012 did not impact the "earning ability" factor under *Sparks* because he was a 72-year-old retiree at the time of the divorce, and defendant did not argue that he should be expected to come out of retirement after the divorce. As for the "contribution" factor, this Court has never expected a spouse to maintain gainful employment or make significant financial contributions to the marital estate. See *Woodington v Shokoohi*, 288 Mich App 352, 366; 792 NW2d 63 (2010) ("[I]t is well established that a non-wage-earning spouse can make substantial contributions to the marital estate by running the household and caring for the parties' children.").

In this case, the trial court found that plaintiff "may have contributed less than his fair share at various times during the 28-year marriage, but it was far more than 'nothing.' " In particular, it found "that the parties had an informal cost sharing arrangement when it came to marital expenses." This finding was not clearly erroneous. By defendant's own testimony, plaintiff used his income to pay for groceries and then allowed her to spend about $1,000 each month for household expenses. This arrangement continued throughout the entire marriage, and defendant's allowance was the same regardless of whether plaintiff was a purchasing-agent manager, a security

---

[5] In her posttrial brief, defendant proposed that plaintiff's share of her pension should be reduced by the amount that plaintiff's retirement funds should have been had he invested it wisely, but she relied on Bing AI to calculate those estimates. The trial court did not err when it refused to adopt calculations generated by artificial intelligence without any basis in law or evidence presented at trial.

guard, or a retiree. The fact that this system continued both before and after the marriage broke down implied that it was a well-established, informal agreement.

During the bench trial, the trial court held that plaintiff's unemployment was not a significant factor to consider under *Sparks*. Indeed, *Sparks*, 440 Mich at 159, explicitly recognized that some factors, even those enumerated in the opinion, may be completely irrelevant or deserve little weight when considering the division of property. The trial court implied that defendant acquiesced in plaintiff's decision to remain underemployed because they stayed married during that time, but defendant noted that the tort trial would provide additional context to explain why defendant may have stayed in the relationship despite objecting to plaintiff's employment decisions. The trial court waited until after the tort trial to enter its order distributing the marital assets, and it still gave a thorough consideration to plaintiff's underemployment in its written opinion. It noted that plaintiff's "contributions to marital expenses remained consistent regardless of where he worked or whether he worked at all," and it concluded that those contributions were not so little as to justify reducing plaintiff's share of the marital estate. We agree. Plaintiff's underemployment had little impact on his financial contributions to the marital estate, so an equitable distribution of assets would not significantly depend on plaintiff's employment history before his retirement.

To the extent that his underemployment was "exploitative" in conjunction with other evidence of economic abuse, that allegation is more appropriately analyzed under the "past conduct" factor. For that factor, the trial court considered the whole of defendant's "economic exploitation" argument, including allegations that plaintiff lied to defendant about filing for bankruptcy to induce her to mortgage the home in her name alone and generally expected defendant to pay for most household expenses. It also acknowledged that plaintiff was at fault in the divorce because he was the "main perpetrator" of the "verbal and emotional abuse" throughout the marriage. The court adjusted the distribution of equity in the marital home to account for the jury's award on defendant's IIED claims, but it did not adjust for the alleged economic exploitation. Notably, the IIED damages were explicitly meant to represent "an amount that will not only compensate her suffering, but will allow her to achieve justice in a divorce case." In other words, at least some of those damages were a form of fault-based distribution of assets, not just compensation for the tort injury. Considering that plaintiff's social security benefits were his only source of income, awarding defendant further compensation for the additional economic exploitation claims could unfairly punish plaintiff and leave him without the means to financially support himself. See *Sands*, 442 Mich at 36 ("[A] judge's role is to achieve equity, not to 'punish' one of the parties."). Accordingly, we are not convinced that adjusting only for the jury award was an inequitable result, regardless whether plaintiff's financial and employment decisions are framed as a lack of contribution to the marital estate or behavior that led to the marriage's failure.

## C. GENERAL PRINCIPLES OF EQUITY

Defendant also believes that reversal is required because the trial court refused to consider the general principles of equity in its opinion, but she fails to explain what unique circumstances the trial court overlooked that rendered its decision inequitable.

Notably, *Sparks* does not require the trial court to consider every factor because in many cases, "some, or even most, of the factors will be irrelevant. But where any of the factors

-16-

delineated in this opinion are relevant to the value of the property or to the needs of the parties, the trial court *shall* make specific findings of fact regarding those factors." *Sparks*, 440 Mich at 159 (emphasis added). The "general principles of equity" factor allows courts to consider circumstances not covered by the other *Sparks* factors that could influence the equitable distribution of assets. See, e.g., *McNamara*, 249 Mich App at 186, (noting that there was "no finding on the record that indicates that the trial court used other general principles of equity that might have been relevant to the property division" and might have justified a division that was inequitable under the other *Sparks* factors). Often, however, facts that are relevant to the general principles of equity will overlap with other *Sparks* factors. See, e.g., *Biondo v Biondo*, 291 Mich App 720, 729; 809 NW2d 397 (2011) (holding that social security benefits are relevant to contributions, necessities and circumstances, and the general principles of equity); *Reeves*, 226 Mich App at 500-501 (Neff, P.J., dissenting) (explaining that the trial court considered the plaintiff's introduction to a wealthy lifestyle after the marriage under both the "general principles of equity" and "life status" factors).

The trial court acknowledged that the general principles of equity was one of the *Sparks* factors, but it explicitly stated, "The Court does not consider this factor." This simply means that the trial court did not consider any circumstances that did not fit into its analysis of other factors. Defendant only refers to the jury verdict on the IIED claims and plaintiff's failure to contribute to the mortgage or financially support the household. But the trial court properly addressed those circumstances under the contribution and fault factors. That evidence was not entitled to special weight just because it might also be described as relevant to the general principles of equity. Defendant highlights no unique facts that the trial court missed, and she does not explain how the other *Sparks* factors fail to adequately capture the equitable circumstances of this case. On our own review of the record, we are not convinced that the trial court's decision not to discuss the general principles of equity separately from the other factors resulted in an inequitable division of assets.

## V. HOME EQUITY

Finally, defendant raises several issues regarding the trial court's valuation and apportionment of the equity in the marital home. None of these arguments is persuasive.

### A. STANDARD OF REVIEW

Findings of fact are reviewed for clear error, but reversal is only required if we are left with the firm conviction that the division of assets was inequitable. *Sparks*, 440 Mich at 152. Questions of law are reviewed de novo. *Cunningham v Cunningham*, 289 Mich App 196, 200; 795 NW2d 826 (2010).

### B. DOWN PAYMENT

The trial court did not err by dividing the marital assets without specifically adjusting for defendant's use of the proceeds from the sale of her previous residence for the down payment on the marital home.

-17-

Defendant relies on *Reeves v Reeves*, 226 Mich App 490; 575 NW2d 1 (1997), to argue that the down payment on the marital home, which came from proceeds on the sale of the home that defendant owned before the marriage, should have been considered separate property, or at least she should have received some credit for that payment under the "contribution" factor of *Sparks*. In *Reeves*, the defendant purchased a condominium with a $14,000 down payment before the marriage. *Id*. at 492. That property became the marital home, but the defendant continued to make all the mortgage payments in his name alone. *Id*. This Court held that any increase in the home's value during the marriage was part of the marital estate, but the down payment and any equity and appreciation occurring before the marriage was the defendant's separate estate. *Id*. at 496.

But this case is distinguishable from *Reeves* because defendant purchased the marital home *during* the marriage. See *Cunningham*, 289 Mich App at 208-209. The parties also stipulated that the marital home "is by law a marital asset" without carving out any exceptions, and they stipulated that its value was $225,000. We decline defendant's request to ignore those agreements and label the down payment as separate property.

Even if the down payment may be appropriately classified as a contribution to the marital estate under *Sparks*, that contribution may not be entirely attributable to defendant. The parties lived together in defendant's former home for the first three years of their marriage, from 1992 to 1995, before moving to the new marital home. Defendant has not specified how much of her down payment was traceable to an increase in her former home's value while it was the marital home during that period. Without further evidence about the purchase and sale of the former home, those calculations were impossible, and there was no way for the trial court to determine the extent to which defendant's down payment derived from her personal contributions to the marital estate. In other words, there was not enough evidence about the down payment to justify treating it any differently than the rest of the equity in the marital home. Accordingly, we are not convinced that the trial court's division of marital assets was inequitable just because it did not credit defendant for her down payment on the marital home.

## C. REPUDIATION THEORY

Alternatively, defendant argues that she was entitled to the entire equity in the marital home because plaintiff repudiated his interest in the property by refusing to put his name on the loan or mortgage, refusing to make any substantial mortgage payments, and failing to otherwise contribute to the value of the home. We disagree.

Defendant admits that there is no applicable caselaw to directly support her repudiation theory, so she relies on the following statute instead:

> The circuit court of this state may include in any decree of divorce or of separate maintenance entered in the circuit court appropriate provisions awarding to a party all or a portion of the property, either real or personal, owned by his or her spouse, as appears to the court to be equitable under all the circumstances of the case, if it appears from the evidence in the case that the party contributed to the acquisition, improvement, or accumulation of the property. The decree, upon becoming final, shall have the same force and effect as a quitclaim deed of the real

estate, if any, or a bill of sale of the personal property, if any, given by the party's spouse to the party. [MCL 552.401.]

According to defendant, because she was the sole owner of the marital home and defendant did not contribute to the property's acquisition, improvement, or accumulation, the trial court could not have awarded plaintiff a portion of the home under MCL 552.401.

But MCL 552.401 only applies when the trial court seeks to invade the spouse's *separate* property. *Reeves*, 226 Mich App at 494-495. Defendant stipulated that the marital home was part of the marital estate, so she cannot now argue that the home was separate property. Even if a person buys a marital home before the marriage with a down payment from separate assets and makes all subsequent mortgage payments, "[t]he sharing and maintenance of a marital home affords both spouses an interest in any increase in its value (whether by equity payments or appreciation) over the term of a marriage." *Reeves*, 226 Mich App at 492, 496. To hold that a spouse repudiates his interest in the home by failing to make direct financial contributions toward the home's equity would unfairly favor the "breadwinner" spouse and undervalue the lower-earning spouse's other financial and nonfinancial contributions. See *Shokoohi*, 288 Mich App at 366. Plaintiff shared the marital home with defendant for over 20 years and maintained the home by contributing groceries and about $1000 each month for other household expenses. Even if these contributions did not have a direct impact on the property's value, every penny that he spent on other household expenses was a penny that defendant could put toward building equity in the home. Accordingly, plaintiff did not repudiate his interest simply by failing to specifically contribute to the home's financing and mortgage payments.

## D. VALUATION DATE

Finally, defendant argues that the trial court abused its discretion when it refused to honor the parties' stipulation regarding the valuation date in their first divorce case before it was voluntarily dismissed. Because the circumstances justified a new appraisal of the marital home and the trial court was not bound by the previous stipulation, we disagree.

Defendant asserts that during the first divorce case, defendant had the marital home appraised at $160,000, but the parties stipulated that the value of the home was $106,000 and that the date of valuation was the date that plaintiff moved out of the marital home in 2018. In the current divorce case, however, plaintiff filed a motion to have the marital home appraised at his expense, noting that the home was never appraised after plaintiff filed for divorce. After a hearing, the trial court granted the motion over defendant's objection. Plaintiff completed the appraisal, and then the parties stipulated that the market value of the home at that time was $225,000.[6] The trial court used this stipulated amount when it divided the marital estate.

Defendant has not pointed to any direct evidence in the record that there was in fact a stipulation as to the value and valuation date in the first divorce case, but her argument fails even

---

[6] The record does not reflect the exact date of the appraisal or stipulation, but defendant states that the stipulation occurred on May 9, 2022.

-19-

if we accept defendant's account of the first case as accurate.[7] The parties' stipulations in the first case were not binding in the second case. "Attorneys as the agents of parties whom they represent in a cause have authority, by virtue of such agency, to make admissions, which are binding upon the parties *in that particular case*; but they have no authority by reason of such relation to bind a party generally by admission of facts." *Isabelle v Iron Cliffs Co*, 67 Mich 120, 124; 23 NW 613 (1885) (emphasis added). Plaintiff served the second complaint for divorce on the same day that the first case was voluntarily dismissed, but these are still two separate cases, and the stipulations from the first case did not automatically carry over to the second. As in any other divorce case, the valuation date of the marital assets was "committed to the court's sound discretion." See *Thompson v Thompson*, 189 Mich App 197, 199; 472 NW2d 51 (1991).

Defendant's request to use the date that plaintiff moved out of the marital home as the valuation date was not without precedent. The date of trial and the date of judgment are the most typical valuation dates, but they are not the only options:

> The inquiry regarding which assets comprise the marital estate is distinct from the question of the valuation of those assets. For the purposes of dividing property, marital assets are typically valued at the time of trial or at the time judgment is entered, though the court may, in its discretion, use a different date. . . . Where the court determines that a particular asset is, in fact, a marital asset, it must then value the asset as of either the date of trial, the date of judgment, or a more appropriate date. [*Byington v Byington*, 224 Mich App 103, 114 n 4; 568 NW2d 141 (1997) (citations omitted).]

For some assets, such as a retirement plan,[8] it may be appropriate to use the date that a spouse files the divorce complaint instead of the date of the divorce judgment if "the objects of matrimony had been irreconcilably destroyed by the time the complaint was filed." *Thompson*, 189 Mich App at 199. Similarly, a panel of this Court has previously upheld a trial court's decision to use the date that a spouse left the marital home as the home's valuation date. *French v French*, unpublished per curiam opinion of the Court of Appeals, issued August 22, 2000 (Docket No. 218816), p 4.

But the move-out date is just one of multiple outcomes that a court may choose, and the circumstances in this case justified ordering a new appraisal to estimate the home's value at some date between the judgment of divorce and the bench trial. Defendant had consistently challenged the accuracy of the $160,000 appraisal associated with the move-out date, arguing that the

---

[7] Defendant's description of the stipulation in the first case has been inconsistent at best. On appeal, she states that the stipulated value was $106,000, but in her response to plaintiff's motion for a new appraisal, she stated both that the stipulated value was "about $106,000 but no more than $160,000" and that stipulated value was "between $106,000 and $160,000." Until the new appraisal, the parties used various estimates for the home's value, but they were all within that range.

[8] The trial court used the date of the judgment of divorce to value defendant's pension. Defendant does not challenge this valuation date.

appraised amount did not account for the significant repairs needed. About three years passed since that appraisal, and defendant had taken out a new $40,000 mortgage, which funded some repairs and improvements to the property. And despite any purported stipulations, both parties used inconsistent and shifting valuations for the home throughout this case. Under these circumstances, it was not an abuse of discretion to start fresh with a new appraisal that more closely estimated the value of the home at the time of the judgment of divorce.

Moreover, regardless of the date of valuation, the parties' "manifestation of the intent to lead separate lives," such as by maintaining separate homes, *Byington*, 224 Mich App at 112, is still relevant to the contribution factor under *Sparks*:

> As a practical matter, we believe that the factor of the "contribution of each party to the marital estate" will generally take on increasing significance with regard to property acquired after such a manifestation. Generally, a court can expect to find a significantly lesser contribution by the nonacquiring spouse with respect to property acquired after public manifestation of an intent to lead separate lives than with respect to property acquired before such a manifestation. . . . In particular, we recognize the possibility that appropriate weighing of the *Sparks* factors may in some cases result in a determination that the nonacquiring party is entitled to no portion of property acquired after a manifestation of intent to lead separate lives because of the difference in the parties' contributions to acquisition of such property. However, we also recognize that consideration of other *Sparks* factors may in other cases require some apportionment of such property up to and including an equal apportionment. [*Id*. at 115-116.]

In this case, the relevant property that was effectively "acquired" after the parties' manifestation of an intent to lead separate lives was any increase in the marital home's equity between the date that plaintiff moved out of the home in 2018 and the judgment of divorce in 2021. Because the home's mortgage was already paid off in 2017, the only possible change to the home's value that was not attributable to passive appreciation of equity accrued before the separation would have been defendant's home repairs. But defendant paid for those repairs with an additional mortgage on the home, so they were sourced from existing home equity that plaintiff indirectly contributed to as previously discussed. Overall, the balance of the parties' contributions to the marital home's equity did not significantly change after plaintiff moved out, so it was not inequitable for the trial court not to adjust the apportionment of equity to account for the three years that plaintiff was not living in the marital home.

## VI. CONCLUSION

In summary, the trial court did not err by issuing a post-tort-trial opinion and order signed by a judge who had not presided over the property-disposition phase of the case. The trial court also did not err by granting plaintiff's motion in limine so as to limit the tort trial testimony to events occurring within the statute of limitations. Although it erred when it limited evidence at that trial regarding plaintiff's alleged economic abuse, that error was harmless. The trial court did not err when it determined an equitable property distribution and valued and apportioned the equity in the marital home; it properly factored defendant's tort recovery and other relevant evidence into

-21-

its analysis when determining the division of marital assets, and we are not firmly convinced that the result was inequitable.

Affirmed.

/s/ Christopher M. Trebilcock
/s/ Mark T. Boonstra
/s/ Anica Letica